James **PARKER**, Plaintiff,

v.

**TEXACO, INC., South Coast Welding & Services, Liberty Mutual Insurance Company, Defendants.**

Norma **PARKER**, Plaintiff,

v.

**TEXACO, INC., Southcoast Welding, Inc., Liberty Mutual Insurance Company, Defendants.**

**Civ. A. Nos. 80–1604, 81–4192.**

United States District Court, E. D. Louisiana.

Aug. 24, 1982.

Kenny M. Charbonnet, William V. Renaudin, Jr., New Orleans, La., for intervenor, Liberty Mut. Ins. Co.

Joshua A. Tilton, Baton Rouge, La., Kevin A. Galatas, New Orleans, La., for plaintiff in No. 80–1604.

Tooley & Waldmann, Lester J. Waldmann, Gretna, La., for intervenor Tooley & Waldmann.

Christovich & Kearney, James F. Holmes, New Orleans, La., for South Coast Welding & Services, Inc. Liberty Mutual Ins. Co.

Lester J. Waldmann, Tooley & Waldmann, Gretna, La., for plaintiff in No. 81–4192.

James F. Holmes, Christovich & Kearney, New Orleans, La., for Liberty Mut. Ins. Co.

James H. Daigle, Hal C. Welch, Lemle, Kelleher, Kohlmeyer & Matthews, Vance E. Ellefson, New Orleans, La., for Texaco, Inc.

Donna D. Fraiche, New Orleans, La., for Westbank Medical Enterprises.

CASSIBRY, District Judge:

The plaintiff brought suit for damages based on unseaworthiness under the general maritime law, negligence under the Jones Act, and for maintenance and cure against Texaco, Inc., the owner of the drilling rig "Matagorda Bay," South Coast Welding & Services, Inc., the plaintiff's immediate employer, and Liberty Mutual Insurance Company, South Coast's insurer.[1] This lawsuit arose as a result of the plaintiff's fall from the vessel "Matagorda Bay" on April 12, 1980. The claim for "cure" was severed from the other claims, and an expedited trial against South Coast and Liberty Mutual only was held on July 19, 1982.

The plaintiff makes no claim for past or future maintenance in view of the fact that he has received maintenance, benefits under the Longshoremen's and Harbor Workers' Compensation Act, and advances in the amount of $30,808.46 for which Liberty Mutual shall receive a credit against any past or future maintenances owed to plaintiff. Thus, Liberty Mutual shall not be required to pay any further maintenance until the full amount of the $30,808.46 has been exhausted in full.[2] The plaintiff does, however, claim payments for past and future medical expenses ("cure"), compensatory damages for the unreasonable failure to

[1]. St. Charles General Hospital intervened in the suit for judgment against the plaintiff and Liberty Mutual for an outstanding hospital bill in the amount of $88,000. Liberty Mutual intervened as the compensation carrier for recovery of payments made under the Longshoremen and Harbor Workers' Compensation Act. Immediately prior to the trial, St. Charles General Hospital settled its claim with Liberty Mutual.

[2]. And, of course, under the Longshoremen and Harbor Workers' Compensation Act, Liberty Mutual may possibly recover the entire $30,808.46 in full from, for example, Texaco, Inc. if it is determined that some negligence by Texaco was the cause of the plaintiff's injury.

provide cure, and attorneys fees incurred as a result of the defendant's arbitrary and capricious failure to provide cure.

## FINDINGS OF FACT

### 1.

Pursuant to a contract with Texaco, South Coast Welding sent its employee, James K. Parker, to work as a rig welder aboard the Texaco drilling rig, Matagorda Bay. The Texaco drilling superintendent testified that at all times his company kept a rig welder aboard its drilling rigs, and that the plaintiff has served in that capacity aboard the vessel on previous occasions. The plaintiff's schedule, as that of the rest of the crew, required him to perform whatever welding services were requested by the Texaco drilling supervisor, including routine maintenance. The drilling superintendent testified that, if he desired, he could request from South Coast Welding the services of a particular welder and that, had the plaintiff not been injured, the superintendent would have asked the plaintiff to return to the Matagorda Bay as the rig welder.

### 2.

On the morning of April 12, 1980, Mr. Parker was ordered by his supervisor to route mud suction lines from the mud room to a mud section unit which was attached by brackets to the side of the rig, making it necessary for Mr. Parker to work directly over the water. Later that morning, the supervisor was informed that there had been an accident and that James Parker was in the water. "The accident report filed by South Coast Welding states that the scaffolding he was standing on fell and he fell 30 feet hitting the barge below and fell into the water." He was sent by crewboat and ambulance to Abbeville General Hospital, where he was diagnosed as having suffered a blunt trauma to the abdomen and a lesion of the liver.

### 3.

From April 12, 1980 until November 24, 1980, the plaintiff underwent surgery and other treatment by numerous physicians at several hospitals, including Abbeville General, South Jefferson, and Jo Ellen Smith. Most, if not all, of these physician and hospital bills were paid by Liberty Mutual.

### 4.

During his last admission to Jo Ellen Smith Hospital, however, Mr. Parker was diagnosed as having developed a pancreatic pseudocyst, and with Liberty Mutual's knowledge, Mr. Parker was admitted to St. Charles Hospital. He remained there, under the care of Dr. I. Brickman and Dr. Stephen Gergatz, until March 30, 1981. During this period of hospitalization, and as a direct result of his abdominal injuries and necessary surgeries, Mr. Parker suffered from and was treated for numerous postoperative complications, including hypertension, for which he has been treated since leaving the hospital. Dr. Brickman testified that the pancreatic pseudocyst was caused by the blunt trauma to the abdomen suffered by the plaintiff upon his fall from the Matagorda Bay. Dr. Gergatz testified that, considering findings that the plaintiff had a normal heart upon admission to the hospital, the plaintiff's hypertension was probably caused by the stress of surgery and extended hospitalization.

### 5.

On April 29, 1981, St. Charles General Hospital sent Liberty Mutual a bill for $99,-000; a substantial part of this bill remained unpaid until July 19, 1982. Exhibits offered into evidence by plaintiff, and testimony elicited from Liberty Mutual employees indicate that the "cure" payment to St. Charles General Hospital was withheld apparently on the basis of some belief that Mr. Parker's medical complaints pre-existed his accident. The defendants, however, produced no evidence at trial to justify such a belief; in fact, as early as February 4, 1981, Liberty Mutual received from Dr. Brickman a report which stated clearly that Mr. Parker's hospitalization was due to his fall at work. This was followed by another report on July 23, 1981 which again set forth in detail the causal relationship between the plaintiff's injury and the fall from the vessel. In September, 1981, Liberty Mutual paid Dr. Brickman, and also paid

a portion of the St. Charles General Hospital bill, but refused to pay Dr. Gergatz and the major portion of the St. Charles General Hospital bill.

Subsequently, Liberty Mutual employed a physician to review Mr. Parker's entire medical record in an attempt to establish that Mr. Parker's medical condition pre-existed his accident. However, by letter of December 28, 1981, this physician informed Liberty Mutual that he could not make such a conclusion. Thereafter, Liberty Mutual conducted no further investigation into the plaintiff's medical condition, yet continued to refuse payment for outstanding medical expenses, and continued to refuse to pay the expenses of Mr. Parker's treating physicians.

### 6.

At the time of trial, Mr. Parker was still under the care of Dr. Gergatz for his hypertension and pancreatic insufficiency. Dr. Gergatz testified that he has been unable to maintain control of these problems and that the plaintiff cannot reach maximum cure without hospitalization for testing, observation, and treatment. Dr. Brickman concurred in that opinion. The plaintiff is also under the care of Dr. Nolan Armstrong for mild cerebral brain dysfunction, dementia, and emotional instabilities, all of which were caused or aggravated by the plaintiff's accident and injuries. Dr. Armstrong further testified that Mr. Parker should be hospitalized for at least two months for psychiatric care simply so that Mr. Parker may once again be able to function productively in society.

### 7.

In addition to the bill from St. Charles General Hospital, which was settled between Liberty Mutual and the hospital on the day of this trial, Mr. Parker proved through testimony and exhibits that he expended or incurred, from April 12, 1980 until trial, expenses for medical treatment in the amount of $12,150.40.[3]

### 8.

As a result of Liberty Mutual's failure to pay plaintiff's medical expenses, the plaintiff has suffered injury, both mental and physical, over the many months since his discharge from St. Charles General Hospital. On July 16, 1981, suffering from a reaction to his heart medication, Mr. Parker was turned away from admission to the hospital because of his outstanding bill. He was treated in the emergency room only through Dr. Gergatz's intervention, and was forced to return home in spite of Dr. Gergatz's specific recommendation of inpatient treatment. Mr. Parker was again refused

---

**3.** Prior to resting its case, plaintiff offered and the Court received into evidence, in globo, medical bills for proof of past medical expenses. An explanation of each bill follows:

A. Westbank Digestive Diseases Clinic for the services of Dr. Henry White to whom Dr. Brickman referred in his testimony and whose services are evident in the Jo Ellen Smith Hospital record which was received in evidence .................. $ 910.00

B. Dr. Alan N. Jacobs, a radiologist, whose services are evident from the St. Charles General Hospital record which was received in evidence ................. 160.00

C. Dr. Isadore Brickman who testified that his bill remains outstanding in the amount of .......................... 325.00

D. Dr. Arnold Lupin, as identified by Dr. Stephen Gergatz for services rendered James Parker while he was in St. Charles General Hospital ................... 3,862.00

E. Dr. Stephen Gergatz, who testified that in addition to the foregoing amount, his bill remains outstanding in the amount of ............................... 730.00

F. New Orleans Orthopedic Clinic for examination and treatment of a back injury which is substantiated in the Abbeville General Hospital and South Jefferson Hospital records, which were received in evidence .......................... $ 535.00

G. Tulane Medical Center, psychiatric treatment rendered by Dr. Gary Cohen for employment related mental disorders set forth in detail by Dr. Armstrong's testimony .......................... 825.00

H. Mercy Health Center for services substantiated in hospital record which was received in evidence ................. 645.75

I. Dr. Lonnie Lamprich, for emergency care at Mercy Health Center as evident in the record............................. 200.00

J. Central Oklahoma Psychiatric Center for the services of Dr. Nolen Armstrong, who testified regarding his services ........ 1,710.00

K. Albert & Wegmann (Prytania Street) for drugs prescribed by Dr. Stephen Gergatz ........................... 2,247.65

12,150.40

admission to the St. Charles General Hospital in September, 1981, when Dr. Brickman recommended hospitalization to check the progress of his recovery.

According to Dr. Gergatz, Mr. Parker still suffers from hypertension, malabsorption syndrome, and reported rectal bleeding; these problems remain uncontrolled or unimproved because of Mr. Parker's inability to gain hospital admission. Dr. Armstrong, who, as noted previously, is treating the plaintiff for psychiatric problems, testified that these problems have worsened and will continue to do so until such time as plaintiff receives hospital care. Furthermore, the mounting medical expenses, the legal action against him by St. Charles General Hospital to collect on its bill which was pending for so long, and the inability to obtain treatment, have caused plaintiff worry and anguish and have aggravated his mental disorders.

### 9.

■ Considering the circumstances involved in this case, the failure to continue cure payments was clearly unreasonable, and even fell to the level of being arbitrary and capricious. Thus, the plaintiff is entitled to recover $105,000.00 as compensation for the aggravation of his physical and emotional problems caused by defendant's arbitrary and capricious refusal to pay cure. This total amount represents an award of $35,000.00 for each physical condition from which the plaintiff was suffering when cure was refused to him: hypertension, malabsorption syndrome, and brain dysfunction.

### 10.

Plaintiff is also entitled to recover attorney's fees incurred. Counsel shall submit briefs to the court regarding the issue of quantum. Plaintiff's brief must be filed no later than September 27, 1982, and a responsive brief must be filed by the defendants no later than October 11, 1982.

## CONCLUSIONS OF LAW

### 1.

■ A seaman's right to maintenance and cure is implicit in the contractual relationship between the seaman and his employer, and is designed to ensure the recovery of those individuals upon injury or sickness sustained in the service of the ship. *Calmar SS Corporation v. Taylor*, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 903 (1938); *Pelotto v. L & N Towing Company*, 604 F.2d 396 (5th Cir. 1979). Maintenance and cure are due without regard to the negligence of the employer or the unseaworthiness of the ship. *Aguilar v. Standard Oil of New Jersey*, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943). Cure involves the payment of therapeutic, medical, and hospital expenses not otherwise furnished to the seaman, until the point of "maximum cure." *Farrell v. United States*, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949); *Pelotto v. L & N Towing Company, supra.*

### 2.

■ In order for a plaintiff to recover maintenance and/or cure, and damages from his employer, there must first be a finding that he is a seaman. The traditional formulation of the requirements for identifying a seaman are that (1) he must have a more or less permanent connection with a vessel, and (2) the capacity in which he is employed or the duties which he performs must contribute to the function of the vessel, the accomplishment of its mission, or its operation or welfare in terms of its maintenance during its movement or during anchorage for its future trips. *Roberts v. Williams-McWilliams Co., Inc.*, 648 F.2d 255 (5th Cir. 1981); *Guidry v. South Louisiana Contractors, Inc.*, 614 F.2d 447 (5th Cir. 1980); *Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir. 1959). Based on the testimony of the Texaco drilling superintendent, it is apparent that the plaintiff was permanently assigned to the Matagorda Bay and, as a rig welder, both aided in its mission and maintained it for future voyages. Therefore, Mr. Parker was a seaman for purposes of this action for cure payments.

### 3.

Based upon the testimony of both lay and expert witnesses and exhibits offered into

evidence, the plaintiff was injured while in the service of the vessel and the injuries sued upon were caused by his accident aboard the Matagorda Bay. *Vella v. Ford Motor Company,* 421 U.S. 1, 95 S.Ct. 1381, 43 L.Ed.2d 682 (1975); *Warren v. United States,* 340 U.S. 523, 71 S.Ct. 432, 95 L.Ed. 503 (1951); *Noble Drilling Corp. v. Smith,* 412 F.2d 952 (5th Cir. 1969).

### 4.

■ Mr. Parker has not reached "maximum cure." Only when it appears probable that further treatment will result in no betterment of the seaman's condition can it be said that the seaman has reached maximum cure. Thus, where it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been reached. *See, e.g., Farrell v. United States, supra; Pelotto v. L & N Towing Company, supra; Brown v. Aggie & Millie, Inc.,* 485 F.2d 1293 (5th Cir. 1973).

■ In this case, however, at the time of trial, Mr. Parker was still being treated for hypertension, malabsorption syndrome, and brain dysfunction. His treating psychiatrist testified not only that Mr. Parker would benefit from further treatment, but that such treatment was definitely necessary. Dr. Gergatz stated that Mr. Parker had not reached maximum cure and would not do so without further hospitalization and treatment. Consequently, the defendant employer had the duty to provide cure continuously from April 12, 1980, and this duty is owed to plaintiff by defendant until such time as plaintiff reaches maximum possible cure.

### 5.

■ If an unreasonable failure to provide maintenance and cure aggravates the seaman's condition, his employer is liable not only for the increased medical expenses and maintenance that may become necessary, but also for the full tort damages that result. *Vaughn v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962);

*Cortes v. Baltimore Insular Line,* 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368 (1932); *Picou v. American Offshore Fleet, Inc.,* 576 F.2d 585 (5th Cir. 1978). If the defendant employer, in failing to provide maintenance and cure, has been callous and recalcitrant, or arbitrary and capricious, reasonable attorney's fees may also be recovered. *Vaughn v. Atkinson, supra; Gaspard v. Taylor Diving Salvage Co., Inc.,* 649 F.2d 372 (5th Cir. 1981); *Blanchard v. Cheramie,* 485 F.2d 328 (5th Cir. 1973).

### 6.

■ In view of the facts involved in this case, it was inexcusable to allow such a large hospital bill to remain outstanding against the injured seaman for a period of fourteen months. In *Vaughn, supra,* the defendants were found to be callous for "making no investigation of libellant's claim and by their silence neither admitting nor denying it." 369 U.S. 527, 530, 82 S.Ct. 997, 999, 8 L.Ed.2d 88. The recalcitrance demonstrated by Liberty Mutual in this case surpasses that displayed in *Vaughn;* Liberty Mutual refused to pay medical expenses in spite of an investigation which revealed that the expenses were due and owing as a result of plaintiff's injury aboard the vessel. The defendant was made aware of the causal relationship three months prior to receiving a bill from St. Charles General Hospital on April 29, 1981. Its refusal to pay soon thereafter must be considered unreasonable. As a result of the unpaid hospital bill, Mr. Parker was denied admission to the hospital on two occasions, and consequently suffered aggravations for which he is entitled to an award for damages.

### 7.

■ The defendant's continued neglect of the plaintiff's medical condition after receiving another detailed report from Dr. Brickman on July 23, 1981 was arbitrary and capricious. Ultimately, the defendant's announcement by letter that it would no longer pay Mr. Parker's medical expenses and its continued refusal to do so until the day of the trial was callous and recalcitrant.

78

## CONCLUSION

The plaintiff has not reached maximum cure, and the defendant must make continuous cure payments until such time as plaintiff reaches maximum cure. The failure of defendant to continue cure payments was unreasonable, arbitrary and capricious. Therefore, in addition to cure payments, the plaintiff is entitled to compensatory damages and attorneys fees.