Dan J. MITOLA, Plaintiff,

v.

### JOHNS HOPKINS UNIVERSITY APPLIED PHYSICS LABORATORY, et al., Defendants.

Civ. A. No. MJG–91–3010.

United States District Court, D. Maryland.

Dec. 3, 1993.

Robert M. Schwartzman, Resnick & Abraham, Baltimore, MD, for plaintiff.

James A. Johnson, Semmes, Bowen & Semmes, Warren B. Daly, Jr., James Warwick, Asst. U.S. Atty. Baltimore, MD, for defendants.

## MEMORANDUM AND ORDER

GARBIS, District Judge.

The Court has before it (1) Defendant's Johns Hopkins University Applied Physics Laboratory ("JHU/APL") Motion for Summary Judgment Against Plaintiff Dan J. Mitola ("Plaintiff" or "Mitola"), (2) Defendant's Alpha Marine Services, Inc. ("Alpha") Motion for Summary Judgment Against Plaintiff Mitola, and (3) JHU/APL's and Alpha's Cross Motions for Summary Judgment on Alpha's Cross Claim. The Court has considered the legal memoranda submitted by the parties and has held a hearing.

## I. INTRODUCTION

JHU/APL is an educational and research facility that also conducts classified missions for the Navy. Beginning in June 1988, JHU/APL chartered the R/V AMY CHOUEST ("the Vessel") from Alpha for the purpose of conducting underwater acoustical research involving the measurement of acoustical wave propagation through the ocean. Plaintiff Mitola, an employee of JHU/APL for 20 years, was stationed aboard the Vessel as the Supervisor of Marine Operations during a voyage that began on November 17, 1988. Mitola's responsibilities included the deployment and recovery of a towed underwater sensor involved in the acoustical research. On November 24, 1988, the Vessel ran into heavy weather several hundred miles off the coast of Bermuda. Mitola was injured when, while out on the Vessel's aft-deck, he was knocked down by a large wave.

Mitola has sued JHU/APL and Alpha for negligence under the Jones Act, 46 U.S.C.App. §§ 688. Mitola also brought actions against JHU/APL and Alpha for the alleged unseaworthiness of the Vessel and for maintenance and cure. In response, Alpha has filed a Cross Claim against JHU/APL, seeking indemnification and/or contribution should it be held liable for any of Plaintiff's injuries. JHU/APL and Alpha have filed Motions for Summary Judgment against Plaintiff, and Cross Motions for Summary Judgment against each other on Alpha's Cross Claim.

For the reasons set forth herein, the Court concludes that:

1. Even assuming Mitola was a "seaman" under general maritime law principles, his Jones Act claim is barred by the Oceanographic Research Vessel Act.

2. Defendants are entitled to summary judgment on Mitola's claim of unseaworthiness.

3. Defendants are entitled to summary judgment on Mitola's claim for maintenance and care.

4. Alpha is entitled to summary judgment against JHU/APL on its indemnity claim.

## II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment must be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. As stated in *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir.1991):

Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Supreme Court has explained that summary judgment is appropriate when a party, after adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Failure of proof of an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552.

Therefore, the Court must view the evidence in the light most favorable to the non-moving party, although realistically. The essential question is whether a reasonable jury could return a verdict for the non-moving party or whether the movant would at trial be entitled to a directed verdict or judgment notwithstanding a verdict for the non-movant.

## III. PLAINTIFF'S JONES ACT CLAIMS

Under federal law, a "seaman" is entitled to sue his employer, and only the single entity determined to be his employer, for negligence pursuant to the Jones Act. 42 U.S.C.App. § 688; *see also Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 791, 69 S.Ct. 1317, 1321–22, 93 L.Ed. 1692, *reh'g denied*, 338 U.S. 839, 70 S.Ct. 32, 94

L.Ed. 513 (1949); *Fitzgerald v. A.L. Burbank & Co.*, 451 F.2d 670, 674 (2nd Cir.1971).

■ The Supreme Court has recently redefined the term "seaman" solely in terms of the employee's connection to a vessel in navigation. *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991). An individual does not have to "aid in navigation" to qualify as a seaman, but his "duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission'" in order for him to achieve seaman status. *Id.* at 355, 111 S.Ct. at 817 (citation omitted).

In this case, looking solely at the Jones Act and general maritime law principles, Mitola can avoid summary judgment on the issue of his status as a "seaman." Indeed, it can be assumed for purposes of this discussion that on the foregoing criteria, he would be a "seaman." However, the foregoing are not the sole criteria to be utilized.

The Oceanographic Research Vessel Act ("ORVA"), 46 U.S.C.App. §§ 441–444, precludes scientific personnel from recovering under certain statutory provisions, including the Jones Act. Section 444 of ORVA reads:

Scientific personnel on an oceanographic research vessel shall not be considered seamen under the provisions of title 53 of the Revised Statutes and Act [sic] amendatory thereof or supplementary thereto.[1]

Section 441(2) of ORVA defines "scientific personnel" as "persons who are aboard a vessel solely for the purpose of engaging in scientific research, instructing or receiving instruction, in oceanography or limnology."

In applying ORVA, courts have held that one vessel may carry both a regular crew not covered by ORVA and a scientific team covered by ORVA. In *Sennett v. Shell Oil Co.*, 325 F.Supp. 1, 3 (E.D.La.1971), the court reviewed the purpose and legislative history of ORVA and held: "Vessels engaged in oceanographic research are operated by a crew that performs the duties usually assigned to seamen. These vessels also carry a complement of scientific personnel who are engaged in research and have nothing to do with the navigation or maintenance of the vessel."

■ When determining an individual's status then, the essential inquiry concerns the individual's basic purpose on board the vessel. *Id.* at 6. Performance of seamen's functions or other manual tasks, if incidental to one's primary scientific research duties, will not change an individual's designation from scientific personnel to seaman. In *Sennett*, the court catalogued the plaintiff's duties, finding that

Albert Sennett worked primarily with the instrument group, reading, maintaining and operating the computers and other instruments that recorded the research information. In addition, Sennett assisted in loading supplies aboard the R/V NIOBE, maintained the stern of the vessel and his living quarters and painted equipment.

325 F.Supp. at 6. Despite the seaman-like nature of some of the plaintiff's tasks, the *Sennett* court held that

[t]he affidavits and depositions filed make it clear that Sennett was aboard the R/V NIOBE for the purpose solely of engaging in scientific research. He may incidentally have done other things but these were not the purpose of his engagement or presence aboard ship. Accordingly, he must be classified as "scientific personnel."

*Id.; see also Presley v. Vessel CARRIBEAN SEAL*, 709 F.2d 406 (5th Cir.1983) (compressor mechanic classified as scientific personnel).

■ This Court is aware that ordinarily, where there is evidence supporting seaman status, the determination of whether an injured employee is a seaman covered by the Jones Act is a question of fact for the jury. *McDermott*, 498 U.S. at 355, 111 S.Ct. at 817. However, the *McDermott* Court made clear

---

1. Specifically, ORVA precludes scientific personnel from recovering under the Jones Act and Death On the High Seas Act as those acts are amendatory and supplemental to Title 53 of the revised statutes. *See Craig v. M/V PEACOCK On Complaint of Edwards*, 760 F.2d 953, 955 (9th Cir.1985); *Presley v. Vessel CARRIBEAN SEAL*, 709 F.2d 406, 409 (5th Cir.1983), *cert. denied*, 464 U.S. 1038, 104 S.Ct. 699, 79 L.Ed.2d 165 (1989); *Sennett v. Shell Oil Co.*, 325 F.Supp. 1, 4 (E.D.La.1971).

that "the court must not abdicate its duty to determine if there is a reasonable basis to support the jury's conclusion.... [S]ummary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." *Id.* at 356, 111 S.Ct. at 818.

■ In this case, there is no genuine issue of material fact as to Mitola's status. He was one of the scientific personnel aboard the vessel and thus not a "seaman" for Jones Act purposes by virtue of ORVA.

Here, the evidence undisputedly establishes that Mitola was a member of the scientific research team, not the Vessel's crew. Mitola has admitted that Alpha's crew was responsible for the transportation and other routine functions of the Vessel, and that the scientific team, including Mitola, was responsible for the testing operations on the back deck. (Mitola Dep. at 28–30; Mitola Aff. ¶ 10.) Mitola testified that he did not handle the ship's lines and had no role in the navigation of the vessel. (Mitola Dep. at 61, 98–99; *see also* Thompson Aff. ¶ 13 ("At no time did Mitola's duties involve the operation, maintenance or provisioning of the vessel R/V AMY CHOUEST.")) His activities confined to the rear deck and laboratory, Mitola had no discernible role in the everyday functioning of the Vessel. That was left to Alpha's Captain and crew. In accordance with this division of duties, the test plan, which distinguished the Vessel's crew from the scientific team, classified Mitola as part of the scientific team. (Mlawski Dep. at 166–67, 174.)

During the voyage, Mitola was primarily responsible for the deployment and recovery of the towed underwater sensor used in the acoustical research and for supervising the overall activity of the JHU/APL members of the scientific team. (Mitola Aff. ¶ 7; Mlawski Dep. at 60–61, 172.) Mitola was specifically chosen to supervise the deployment and retrieval process because he possessed the necessary qualifications and had developed the specialized techniques and equipment used in the process. (Mitola Dep. at 93–98, 25–28.) On board, Rafal Mlawski, the head of the scientific team, relied upon Mitola's specialized training and expertise in coming to joint decisions with Mitola regarding the deployment and retrieval of test devices. (Mlawski Dep. at 61–63.) The other members of the Vessel's crew did not, and because of the complex nature of the procedure were not permitted to participate in the deployment/retrieval process. (Mitola Dep. at 170–73; Thompson Suppl.Aff. ¶¶ 17, 21.) Alpha's crew also did not ordinarily use any of the equipment associated with the underwater research. (Mlawski Dep. at 73.) The deployment/retrieval process was accomplished solely by members of the scientific team under Mitola's supervision. (Mitola Dep. at 90–91; Mlawski Dep. at 63–65, 73–75.) This was because the deployment and retrieval of a towed array such as the one used on the Vessel requires specialized training and expertise far beyond that possessed by the ordinary seaman. (Thompson Suppl. Aff. ¶¶ 9–21.)

Mitola contends that his functional capacity aboard the Vessel was that of a seaman, whose job entailed on-deck rigging, involving the operation of cranes and winches above the aft-deck of the Vessel and the handling of lines, cables and shackles. (Mitola Aff. ¶ 7.) However, the mere performance of such manual duties fails to transform Mitola into a seaman. It appears clear from the evidence submitted that Mitola only performed such tasks in furtherance of and incidental to his essential duty: the deployment and recovery of the towed underwater sensor being used in the scientific research activity.[2]

Moreover, Mitola's duties went far beyond the merely manual. Mitola served on the committee that chose the AMY CHOUEST and designed the retrofit necessary for the research activities. (Mitola Dep. at 31–39.) He chose, designed, reconfigured or relocated the equipment used on the back deck of the Vessel for the deployment and retrieval of test devices. (*Id.* at 40–60.) On board, Mitola had responsibility for the deployment and retrieval of the test devices, (Mitola Dep. at 28–30; Mlawski Dep. at 60–61), and also monitored the data from other underwater devices with equipment located in the scientific instrumentation space in the laboratory

2. Mitola appears to admit as much. (Mitola Aff. ¶ 7.)

section of the Vessel. (Mlawski Dep. at 167–69.)

Mitola's considerable expertise in the field of deployment/retrieval, his extensive involvement in preparing for and executing the highly technical acoustical research mission, coupled with his lack of participation in the everyday functioning of the Vessel, show that Mitola was aboard the Vessel for the purpose solely of engaging in scientific research. He may have done other things, but these were only incidental to his basic purpose: participation in the scientific research activities being conducted on the Vessel. As there is no reasonable basis to support a jury conclusion that Mitola was a member of the Vessel's crew, he must be classified as "scientific personnel."

By virtue of ORVA's exclusionary language, the Act prevents scientific personnel from being classified as "seamen" for the purposes of the Jones Act. As a result, scientific personnel cannot recover on Jones Act claims. *See supra* note 1. Thus, regardless of whether JHU/APL or Alpha is determined to have been Mitola's employer during the voyage, this Court's categorization of Mitola as one of the scientific personnel under ORVA prevents Mitola from maintaining his Jones Act claim against either Defendant. Accordingly, summary judgment on this claim is warranted.

## IV. PLAINTIFF'S UNSEAWORTHINESS CLAIMS

 Although classification as scientific personnel under ORVA precludes an individual from being considered a seaman for purposes of the Jones Act, it does not prevent that individual from being a "seaman" under general maritime law for other purposes. *Craig*, 760 F.2d at 956; *Presley*, 709 F.2d at 408; *Sennett*, 325 F.Supp. at 6. Accordingly, a plaintiff who can establish his seaman status by showing that his "scientific duties 'contributed to the function of the vessel or the accomplishment of its mission,' like the contribution made by the 'surgeon crew member of a floating hospital,'" *Sennett*, 325 F.Supp. at 5, may still be eligible for the benefits granted seamen by general maritime

law. These benefits include the warranty of seaworthiness.

 Every shipowner owes to every member of the crew of its vessel the duty of keeping and maintaining that vessel in a seaworthy condition at all times. A vessel is in seaworthy condition when it is in a condition reasonably suitable and fit for the purpose or use for which the vessel is intended. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960).

 Here, even if Mitola could establish himself as a seaman entitled to benefit from the doctrine of seaworthiness, and that either or both of the Defendants owed him such a duty, summary judgment would still be appropriate. Based on the evidence currently before the Court, there appears to be no genuine issue of material fact as to the Vessel's seaworthiness.

By Mitola's own admission, there was no unsafe condition of the Vessel that caused or contributed to the accident and/or his alleged injury. (Mitola Dep. at 116.) In his deposition, Mitola did not claim that any safety equipment was lacking, (*id.* at 147–48), and asserted that he was unaware of any equipment that was not properly secured. (*Id.* at 99–100.) In the absence of additional evidence upon which a jury might rely in finding the Vessel to have been unseaworthy, there exists no dispute of material fact regarding the Vessel's unseaworthiness. Consequently, JHU/APL and Alpha are entitled to judgment as a matter of law.

Mitola asserts that there exists a genuine issue of fact on the issue of the Vessel's seaworthiness, given that "[t]here are still many unresolved questions concerning how the injury occurred and specifically how the equipment should have been properly secured...." However, Mitola does not point the Court to any evidence in support of these bald assertions. Mitola's Complaint contains no specific contentions of unseaworthy conditions and nowhere in his responses to the Defendants' Motions for Summary Judgment does Mitola refer to statements in affidavits, deposition testimony, or any other evidence tending to support a finding of unseaworthiness. As a result, Mitola has failed to carry

the burden Rule 56 imposes on the non-moving party to "go beyond the pleadings, and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (citation omitted). Despite having adequate time for discovery, Mitola has not made any, much less any sufficient showing of the Vessel's unseaworthiness, an essential element of his claim. As a result, summary judgment should be granted in favor of JHU/APL and Alpha on the unseaworthiness claims.

Plaintiff's counsel made a last desperate effort to create a genuine issue of material fact at the hearing. He alleged that the lack of a sufficient number of safety harnesses "inside" the Vessel in the "workshop area" rendered the Vessel unseaworthy. Not only is Plaintiff's counsel's assertion that this condition rendered the Vessel unsafe contradicted by Mitola's own deposition testimony,[3] but if anyone was responsible for this allegedly unseaworthy condition, it was Mitola himself. Mitola chose, designed, and determined the location of the equipment used on the back deck, (Mitola Dep. at 40–60, 128), including the safety equipment. (*Id.* at 59, 146, 178.) In light of Mitola's own testimony, Plaintiff's can identify no genuine dispute of material fact as to the Vessel's unseaworthiness and, as a result, JHU/APL and Alpha are entitled to summary judgment on this issue.

■ Finally, Mitola argues that his testimony regarding the "imprudent" decision to drive the Vessel through the eye of a hurricane, (*id.* at 116), a decision purportedly made in part by Alpha's Captain and which allegedly resulted in Mitola's injuries, puts the issue of the Vessel's seaworthiness in dispute. Even assuming the truth of this allegation, a single negligent act committed by an otherwise competent crew member cannot render a ship unseaworthy.

■ This well-established principle derives from the basic distinction between liability based upon seaworthiness and that based upon negligence. *Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 499, 91 S.Ct. 514, 517, 27 L.Ed.2d 562 (affirming grant of summary judgment in favor of ship-owner where plaintiff was injured as result of co-worker's negligent operation of power winch), *reh'g denied,* 401 U.S. 1015, 91 S.Ct. 1247, 28 L.Ed.2d 552 (1971). Unseaworthiness is a *condition* of the vessel, her appurtenances, her cargo or her crew, and "how that condition came into being—whether by negligence or otherwise—is quite irrelevant to the owner's liability for personal injuries resulting from it." *Id.* Thus, to deem a vessel unseaworthy because of a isolated personal act of negligence would destroy the distinction between seaworthiness and negligence. *Id.* at 500, 91 S.Ct. at 518; *see also Reederei Franz Hagen v. Diesel Tug Resolute,* 400 F.Supp. 680, 688 (D.Md.1975); *Barlow v. Ugland Management,* 353 F.Supp. 1046 (D.Md. 1973).

*Usner* does not go so far as to say that the negligence of a crew member will never render a vessel unseaworthy. As this Court has noted:

> The distinction which the Court in *Usner* is drawing might be paraphrased as follows: A condition, transitory or otherwise, of a crew member (lack of skill, knowledge, etc.) rendering him not fit for his ordinary duties or not up to the ordinary standards of his profession renders the vessel unseaworthy; an isolated act of negligence committed by an otherwise competent crew member does not.

*Hogge v. SS Yorkmar,* 434 F.Supp. 715, 736 (D.Md.1977) (finding that pilot's lack of knowledge of mandatory requirements for passage through canal rendered vessel unseaworthy). Thus, a plaintiff will be able to avoid summary judgment by producing evidence indicating that the crew member who caused or contributed to the accident was

---

3. Mitola asserted that no safety equipment was lacking. (Mitola Dep. at 147–48.) In addition, Mitola stated in his deposition that he chose, *for safety's sake,* to place the majority of the safety harnesses in a storage "van" on the deck rather than inside the Vessel. (*Id.* at 178.) The safety

equipment was kept in the van, Mitola explained, because members of the scientific team would forget to bring their safety equipment from the confines of the Vessel when "flying out" to the on-deck launch and recovery site. (*Id.*)

unfit or incompetent, such that a "condition" existed rendering the vessel unseaworthy.

■ In this case though, construing the facts in a light most favorable to the Plaintiff, Mitola has merely alleged that the Alpha Captain's decision to drive the Vessel through the hurricane was "imprudent." Mitola has offered no evidence that the degree of skill and knowledge of the Captain of the Vessel rendered him incompetent and thus created a condition of unseaworthiness. Mitola's allegation "of a single, isolated incident of operational negligence gives rise of a cause of action based on negligence, but not to one based on unseaworthiness." *Campbell v. Seacoast Products, Inc.*, 581 F.2d 98, 99 (5th Cir.1978). In sum, the Defendants are entitled to summary judgment on the unseaworthiness claim.

## V. PLAINTIFF'S MAINTENANCE AND CURE CLAIM [4]

■ Maintenance and cure are traditional maritime remedies which provide an injured seaman with a daily subsistence allowance and payment of reasonable medical expenses without regard to fault. *See Pelotto v. L & N Towing Co.*, 604 F.2d 396, 397 (5th Cir. 1979). Even if Mitola could establish his status as a seaman, a prerequisite to recovery for maintenance and cure,[5] it does not necessarily follow that he is entitled to any recovery in this case.

■ "The entitlement to maintenance and cure ends when the seaman reaches the date of maximum possible cure, the point at which further treatment will probably not improve his condition." *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1359 (5th Cir.1987). The definition of maximum cure has been further refined and held to be the point at which "the incapacity is, from a medical standpoint, declared permanent." *Clauson v. Smith*, 823 F.2d 660, 661 n. 1 (1st Cir.1987).

■ The date of maximum cure as regards Plaintiff is, by his own admission, April 1989. At that time, Mitola received the opinion from two doctors that there was no cure for his back condition. (Mitola Dep. at 109–111.) Significantly, at no time following the issuance of the opinion that, in essence, his condition was "permanent," has Mitola sought any further treatment. (*Id.* at 131–32.) Allegations that Mitola's condition is deteriorating and that there may be treatment that would alleviate the possibility of future injury does not change the fact that there has been a determination that nothing can be done to *improve* Plaintiff's physical condition. The absence of the potential for improvement is the definition of maximum cure [6] and, based on Mitola's own testimony, he has reached it.

Given that Mitola, if entitled to maintenance and cure benefits at all, was owed such benefits only up until April 1989, the undisputed evidence indicates that he has already received the compensation owed him, if not more. Therefore, Mitola cannot assert his claim for maintenance and cure.

Up until April 1989, Mitola continued to work for JHU/APL and receive his regular salary of $60,000. Maintenance is intended to provide for the cost to the seaman of food and lodging comparable in quality to that the seaman is entitled to at sea. *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528, 58 S.Ct. 651, 653, 82 L.Ed. 993 (1938); *see also Castro v. M/V Ambassador*, 657 F.Supp. 886, 887 (E.D.La.1987) (rate at which maintenance is to be paid seaman ordinarily reflects cost of food and lodging in particular area, comparable to that received on board vessel). The salary Mitola continued to receive up until the date of maximum cure almost surely exceeds any per diem subsistence allowance Mitola would be entitled to as a maintenance remedy. *See, e.g., Barnes v. Andover Co., L.P.*, 900 F.2d 630, 635 (3rd Cir.1990) ("Since

---

4. Plaintiff has conceded that JHU/APL is his employer for purposes of his maintenance and cure claim, and thus is the only defendant potentially liable for such obligations.

5. *See Parker v. Texaco, Inc.*, 549 F.Supp. 71, 76 (E.D.La.1981).

6. *See Belcher Towing Co. v. Howard*, 638 F.Supp. 242, 244 (S.D.Fla.1986) (finding employer not under duty to provide maintenance and cure where further treatment of seaman who continued to suffer from aches and injuries provided no reasonable medical possibility of curing him or effecting permanent improvement of alleged chronic and static condition).

the 1940's most courts have generally awarded $8 a day as maintenance to seamen.") (citations omitted); *Morel v. Sabine Towing & Transp. Co.*, 669 F.2d 345, 347–48 (5th Cir.1982) ($20 a day for maintenance in Port Arthur, Texas); *Incandela v. America Dredging Co.*, 659 F.2d 11, 14 (2nd Cir.1981) ($26.80 a day for maintenance in New York City); *Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129, 1132–33 (5th Cir.1981) ($15 a day for maintenance in New Orleans).

Furthermore, until April 1989, JHU/APL's insurer paid all of the invoices of Mitola's treating physicians.[7] Having already received everything he might be entitled to, Plaintiff can no longer pursue his maintenance and cure remedy. JHU/APL is therefore entitled to summary judgment.

█ Even if the Court were to determine that Mitola has not yet reached the point of maximum cure, he still would not be entitled to any maintenance and cure benefits. As for maintenance, Plaintiff received the same salary at his subsequent job in Florida that he was being paid at JHU/APL at the time of his departure.[8] Approximately one year after leaving JHU/APL, Plaintiff voluntarily chose, for personal reasons, to leave Florida for Michigan, and consequently to take a large pay cut.[9] Even assuming for the sake of argument that the daily subsistence allowance provided for by the maintenance remedy is measured by a plaintiff's salary at the time of injury, there is no reason why Mitola should be entitled to the difference between his current and past salaries when it was his decision, motivated not by his physical condition, but by personal considerations, to switch to a lower paying job. And as for cure, since Plaintiff has incurred no therapeutic, medical, or hospital expenses since

leaving JHU/APL's employ, he has no claim for such benefits.

## VI. JHU/APL'S AND ALPHA'S CROSS MOTIONS FOR SUMMARY JUDGMENT ON ALPHA'S CROSS CLAIM

In its Cross Claim, Alpha demands that JHU/APL indemnify it on the basis of an express provision in the Time Charter Agreement between it and JHU/APL, which reads:

> JHU/APL shall indemnify, defend and hold harmless ALPHA from and against any and all claims, demands, causes of action or suits, including fees of counsel and costs, for personal injury or death (including any survivor's action) brought by or on behalf of employees of JHU/APL ... whether occasioned, caused or brought about in whole or in part by the negligence or fault of ALPHA, its agents or employees or by the unseaworthiness of the Vessel.

(Time Charter Agreement ¶ 8.2.)[10] Since all of Plaintiff's claims against Alpha have been disposed of by summary judgment, Alpha's indemnity claim now consists of a demand that JHU/APL pay the costs, including attorney's fees, it incurred in defending against Plaintiff's suit up until this point.

The enforceability of the indemnity provision turns upon the application of the Longshore and Harbor Workers' Compensation Act (the "LHWCA" or "the Act"), 33 U.S.C. §§ 901–950, to Mitola's injuries. The LHWCA requires automatic, no-fault payment of fixed workers' compensation benefits by the employer to injured employees covered by the Act. Such no-fault liability is the exclusive liability of the employer to the in-

---

7. The only other doctors Plaintiff has seen (and JHU/APL has not paid for) are those to whom Mitola was referred in preparation for litigation, not for treatment. (Mitola Dep. at 153–54.)

8. Because Plaintiff was receiving a "daily subsistence allowance" from another source, namely his Florida employer, JHU/APL had no maintenance obligation during that period. *See Johnson v. United States*, 333 U.S. 46, 50, 68 S.Ct. 391, 393–94, 92 L.Ed. 468 (1948) (vessel owner has no obligation to provide maintenance and cure if it is furnished by others at no expense to

seaman); *Shaw v. Ohio River Co.*, 526 F.2d 193, 201 (3rd Cir.1975) (same).

9. Plaintiff's counsel estimated that Mitola is currently earning between $15,000 and $20,000.

10. The Cross Claim, in its present form, also seeks indemnity in tort (or restitution) under general maritime law and contribution on a joint tortfeasor theory. Because the contractual indemnity claim is dispositive of the outstanding issues, the Court need not address the other counts contained in the Cross Claim.

jured employee *or anyone else* on account of the injury. Section 905(a) provides, in pertinent part:

> [t]he liability of an employer prescribed in Section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee . . . and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death. . . .

This exclusivity provision, JHU/APL asserts, bars any indemnity claim by Alpha.

Furthermore, JHU/APL argues, the LHWCA expressly prohibits any claim for indemnification by a shipowner against an employer. In support of this contention, JHU/APL relies upon § 905(b), which provides that in the event of an injury to a person covered by the Act:

> such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third-party . . . and the *employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.*

(emphasis added). Accordingly, subparagraph 8.2 of the Time Charter, which requires JHU/APL to indemnify and hold Alpha harmless from and against all claims, demands, causes of action or suits for personal injury, is void and unenforceable.

However, in order for JHU/APL to avoid the plain language of the Time Charter's indemnity provision, Mitola must be an employee covered by the LHWCA. The LHWCA provides:

> [C]ompensation shall be payable under this chapter in respect of disability or death of an employee, but only if disability or death results from an *injury occurring upon the navigable waters of the United States* (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or any other adjoining area custom-

arily used by an employer in loading, unloading, repairing or building a vessel). 33 U.S.C. § 903(a) (emphasis added). Mitola was injured while the Vessel was on the high seas, some 375 nautical miles off the U.S. coast.[11] Alpha argues that because Mitola's injury occurred while the Vessel was on the high seas, which do not constitute "navigable waters of the United States" within the meaning of the LHWCA, he falls outside the coverage of the Act. As a result, the Act's provisions do not prohibit the indemnity which Alpha seeks.

The Court knows of no binding authority for the proposition that the phrase "navigable waters of the United States," as used in the LHWCA, always, or even usually, includes the high seas.[12] The only courts that have extended LHWCA coverage to accidents occurring on the high seas merely went so far as to conclude that the Act *can* or *may* be applied to such accidents. *See Reynolds v. Ingalls Shipbuilding Div., Litton Systems, Inc.,* 788 F.2d 264, 268 (5th Cir.) ("We conclude, however, that navigable waters of the United States may include the high seas, and that both the legislative history of the LHWCA as well as the congressional objectives underlying the Act mandate that the Act apply to Reynolds."), *cert. denied,* 479 U.S. 885, 107 S.Ct. 278, 93 L.Ed.2d 253 (1986); *Cove Tankers Corp. v. United Ship Repair, Inc. (Cove Tankers II),* 683 F.2d 38, 41 (2nd Cir.1982) ("[W]e do not believe it necessary to engage . . . in the difficult analysis of whether the phrase 'navigable waters of the United States' always, or even usually, includes the high seas within the meaning of the Act (footnote omitted). We see the issue before us as a much more limited one: Can the Act *ever* be applied when an injury occurs on the high seas? We answer that question in the affirmative, and we rest our analysis on the special facts of this case. . . .") (emphasis in original).

---

**11.** At the time of Mitola's injury, the high seas lay seaward of the territorial waters of the United States, which extend three miles from the coast. *United States v. Hilton,* 619 F.2d 127, 131 n. 1 (1st Cir.), *cert. denied,* 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980). On December 27, 1988, President Reagan extended the territorial sea to twelve nautical miles. Exec.Order No.

5928, 54 Fed.Reg. 777 (1989). Thus, Mitola's accident occurred well beyond U.S. territorial waters.

**12.** *But see Cove Tankers Corp. v. United Ship Repair, Inc. (Cove Tankers I),* 528 F.Supp. 101 (S.D.N.Y.1981) (subsequently limited by reviewing court).

■ .The Court is willing to assume, for purposes of this analysis, that the LHWCA *can* be applied when an injury occurs on the high seas. However, after examining the legislative history of the LHWCA, the policy considerations underlying the extension of the Act's coverage to the high seas, as well as comparing the facts of this case with those of cases in which coverage has been afforded to high-seas injuries, this Court concludes that the LHWCA should not be applied to Mitola's injuries.

In 1972, amendments to the LHWCA extended coverage to shoreside areas. Although Congress did not directly address the Act's seaward reach,[13] judicial opinions interpreting the post–1972 version of the LHWCA and identifying the motivations behind the 1972 changes are helpful in deciding where extension of the Act to injuries occurring on the high seas is appropriate.

It is clear from the legislative history that Congress' general intent in enacting the 1972 Amendments to the LHWCA was to insure that workers not cease to be covered by the mere fortuity of crossing a line. *See, e.g., Director OWCP v. Perini North River Assocs.,* 459 U.S. 297, 103 S.Ct. 634, 74 L.Ed.2d 465 (1983); *P.C. Pfeiffer Co. v. Ford,* 444 U.S. 69, 83 n. 18, 100 S.Ct. 328, 337 n. 18, 62 L.Ed.2d 225 (1979) ("Congress was especially concerned that some workers might walk in and out of coverage.") · Accordingly, the *Reynolds* and *Cove Tankers II* courts stressed the fortuity of the plaintiff workers' presence on the high seas in their decisions to extend LHWCA coverage to their injuries. The Fifth Circuit noted in coming to its conclusion: "[I]t merits emphasis that the context we confront is highly unusual, involving, as it does, a shipfitter, ordinarily accustomed to working on or near shore, who *happens to have been* several nautical miles out at sea." *Reynolds,* 788 F.2d at 269 (emphasis added). And in *Cove Tankers II,* the Second Circuit cited as one of the "special facts" upon which it rested its analysis that "[d]uring the voyage, the vessel deviated

from its scheduled course onto the high seas 135 miles offshore." 683 F.2d at 39.

In contrast, Mitola's presence on the high seas was both contemplated by the Vessel's itinerary and a necessary incident of the research mission of which Mitola was a part. Although the Vessel departed from Baltimore, Maryland, and returned to shore at Ft. Lauderdale, Florida, this was not your ordinary "voyage between two United States ports [which] went on the high seas for a portion thereof." *Id.* at 42. The purpose of the voyage, known to all of its participants, including Mitola, was to conduct acoustical research on the high seas. Mitola did not just "happen to have been" on the Vessel when it entered the high seas, nor did the Vessel "deviate" from its course to reach the point 375 miles offshore where Mitola's injuries occurred. As a result, the facts of the case at Bar do not warrant an extension of LHWCA coverage to Mitola's injuries in order to avoid "the shifting and fortuitous coverage that Congress intended to eliminate." *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 274, 97 S.Ct. 2348, 2362–63, 53 L.Ed.2d 320 (1977).

The "longshoreman" status of the injured workers also played a significant role in those decisions extending LHWCA coverage to injuries occurring on the high seas. In *Reynolds,* the court held that the Act covered "a shipfitter, ordinarily accustomed to working on or near shore." 788 F.2d at 269. And in *Cove Tankers II,* the Second Circuit emphasized that "the employees were performing traditional ship repair functions of the sort covered by the Act." 683 F.2d at 41. In both cases, the courts explicitly took notice of the fact that the usual duties of the plaintiffs consisted of traditional longshoreman work.

The significance of this fact becomes clear when one returns to the policy considerations underlying the 1972 Amendments to the LHWCA. In those Amendments, Congress sought to reduce the importance of the situs of the injury in order to prevent workers clearly covered by the Act from walking in

**13.** *See Cove Tankers II,* 683 F.2d at 42 ("However, Congress did not consider that this same employee might by chance repair a ship while it

moves in and out of territorial waters without entering the waters of any foreign nation.")

and out of coverage. *See Pfeiffer*, 444 U.S. at 83 n. 18, 100 S.Ct. at 337 n. 18. Consistent with this congressional intent, the Fifth and Second Circuits extended LHWCA coverage to longshoremen who clearly met the status requirement for LHWCA protection, regardless of the fact that they were working on the high seas at the moment of injury. *See Reynolds*, 788 F.2d at 272 ("[L]ongshoremen may on occasion have their jobs carry them out to sea. That this happens rarely does not mean that when it does, longshoremen lose their protection."); *Cove Tankers II*, 683 F.2d at 42 ("We believe that failure to apply the Act on the facts before us would be inconsistent with congressional intent to reduce the importance of situs as applied to employees who might otherwise be covered for only a part of their work.").

Declining to extend LHWCA coverage to Mitola, however, would not offend the "primary purpose of the 1972 amendments, [namely] to eradicate the inequity of a scheme where longshoremen could walk in and out of coverage." *Reynolds*, 788 F.2d at 270. Mitola did not perform the functions of a longshoreman or harborworker in the strict sense of those words. None of his duties related to loading, discharging, building, or repairing vessels. Mitola was a scientific technician, and for 320 to 355 days of each year worked at JHU/APL's place of business ashore, designing retrofits, choosing equipment for research missions, etc. (JHU/APL's Third Suppl.Mem. at 28.) Thus, unlike the workers in *Cove Tankers II* and *Reynolds*, who were clearly covered by the LHWCA during the vast preponderance of their work ashore, it is, at the least, unclear whether Mitola was entitled to the protection of the LHWCA for the (substantial) part of the year during which he worked predominantly on land. Denying Mitola LHWCA coverage for the injuries he sustained on the high seas would not produce the undesirable result sought to be avoided in *Reynolds* and *Cove Tankers II*, namely a lapse of coverage for workers otherwise clearly within the protection of the LHWCA who temporarily strayed beyond an artificial seaward boundary.

Finally, both the *Reynolds* and *Cove Tankers II* courts expressed the concern that if they were to deny LHWCA coverage to the plaintiffs solely because their injuries occurred on the high seas, shipowners could easily avoid the obligations imposed by the Act. The Second Circuit explained:

> Were we to follow the reasoning urged upon us by the shipowner, that the Act can never apply to waters farther than three miles offshore, ... shipowners could by mere course deviation into waters beyond that limit, prevent employees, should they be injured, from receiving the Act's benefits and avoid the Act's prohibition against indemnification.... [P]araphrasing the Supreme Court, we do not think that Congress intended the Act's coverage to shift with the shipowner's whim. *Pfeiffer*, 444 U.S. at 83, 100 S.Ct. at 337.

*Cove Tankers II*, 683 F.2d at 42; *see also Reynolds*, 788 F.2d at 272 ("To hold in this case that the three-mile line constitutes the outer boundary of the LHWCA would be to introduce hard lines and to create a statute which builders testing their ships could easily and purposefully sail beyond.").

These concerns are not raised by the facts of the case at Bar. The research function of the voyage in question, unlike a "test run," *required* an excursion onto the high seas. In addition, the Vessel's itinerary, of which Mitola was presumably aware, explicitly contemplated that the majority of the voyage would take place on the high seas. Consequently, because the facts present absolutely no threat of a course deviation designed to avoid LHWCA coverage, a finding that Mitola's injuries are not covered by the LHWCA does not raise the specter of a shipowner being able to avoid the requirements of the LHWCA at his "whim."

Because the LHWCA does not apply to Mitola's injuries, there is no bar to the enforcement of the indemnity provision contained in the Time Charter agreement. Furthermore, since JHU/APL has not put forth any evidence creating a genuine issue of material fact as to the meaning or application of what appears to be an unambiguous contractual provision, summary judgment in favor of Alpha on its indemnity claim is appropriate.

**364**

## VI. CONCLUSION

For the foregoing reasons:

1. Defendant JHU/APL's Motion for Summary Judgment Against Plaintiff shall be **GRANTED;**

2. Defendant Alpha's Motion for Summary Judgment Against Plaintiff shall be **GRANTED;**

3. Defendant Alpha's Motion for Summary Judgment on Alpha's Cross Claim shall be **GRANTED;**

4. Defendant JHU/APL's Motion for Summary Judgment on Alpha's Cross Claim shall be **DENIED.**