Thomas T. BRADSHAW, Jr., Libellant,

v.

THE Trawlers CAROL ANN and THE EL RANCHO, Respondents.

Ad. 153.

United States District Court
S. D. Texas,
Brownsville Division.

Dec. 20, 1956.

was moored portside to the dock, the Pat & David portside to the El Rancho and the Carol Ann portside to the El Rancho. Crew members of the Carol Ann, the outside vessel, had to cross the decks of the other two vessels in going ashore, or returning to, the boat. This, of course, was known to, and expected by, the owners and the masters of all three vessels. The docking arrangement was common to the Conn Brown Basin, the only difference in the pattern being in the arrangement of the vessels from time to time, depending on which vessel docked first. A vessel moored to the dock and permitting safe passage to other crews on one occasion could be the "out" vessel on the next, claiming the same right of ingress and egress for its crew.

Libellant was a member of the crew of the Carol Ann. On the late evening of April 3, 1954, libellant was inebriated to some extent, "sufficient to interfere with his locomotion," as a result of drinking beer. He was, I think, returning to the Carol Ann (instead of leaving it, as he testified), and fell into an open hatch while attempting to cross the deck of the El Rancho. He suffered severe and painful injuries, including a fractured hip which confined him to a hospital for more than four months. He sues the Carol Ann for maintenance and cure and both vessels for damages on the ground of unseaworthiness.

### Maintenance and Cure.

Libellant was in the Marine Hospital at Galveston[1] from shortly after his injury until August 5, 1956. At that time, according to his clinical record, the following occurred:

"By 8/5/54 the patient had been on ambulation on crutches with very light weight bearing for considerable length of time. Due to his prolonged hospitalization he requested a pass to go to the movie and this

Mandell & Wright, Ben N. Ramey, Houston, Tex., for libellant.

Kleberg, Mobley, Lockett & Weil, R. W. Woolsey, Corpus Christi, Tex., for The Carol Ann.

Wylie & Ellis, Aransas Pass, Tex., for The El Rancho.

ALLRED, District Judge.

The Carol Ann, the Pat and David and the El Rancho, shrimping vessels, were moored parallel to one another alongside the dock in Conn Brown Basin at Port Aransas, Texas. The El Rancho

---

1. He first was taken to hospitals in Aransas Pass and Corpus Christi.

was granted. He returned from the pass in a condition of fairly acute intoxication according to the ward personnel but caused no disturbance. He was therefore readmitted but later that evening he got up and went outside the hospital building after hours and was found in association with another patient who was found to have a new bottle of an alcoholic beverage in his possession. Following examination by the officer of the day on this occasion the patient was discharged for his conduct. Prior to this time the patient's conduct and cooperation had been most satisfactory. He was seen by the ward doctor when he returned to the hospital on the morning following discharge *and it was felt that if he desires to return here for outpatient care he will be given same.* It is estimated that he will be totally disabled for his usual work for a period of at least three to four months from this date."[2]

At the time of his discharge libellant had attained about the maximum benefits that could have been secured from hospital treament and would shortly have been discharged to an outpatient basis. He still was in pain and on crutches, in need of outpatient therapy. This continued to November 23, 1954, when he went to work as a rigman and worked until December 4th. He was off again until December 26th, when he was employed on a seismograph supply boat. I doubt, however, that this lay-off, from December 4th to December 26th, was due to his physical condition. More likely it was on account of the Christmas season.

The Carol Ann contends that the claim for maintenance and cure should be rejected because libellant's conduct was such that the hospital discharged him "for disciplinary reasons—a situation which has been held to be tantamount to his rejection of treatment," citing Norris, The Law of Seamen, Vol. 2, p. 225, § 593.[3] Libellant, recognizing that at first blush his discharge might appear to cut off his right to maintenance, points to his undisputed testimony that afterward he received treatment as an outpatient at the Public Health Service Hospital and that his purpose in leaving was to get out of a hopeless atmosphere and rehabilitate himself and cites cases[4] holding that the right to maintenance and cure are not dependent upon the patient being under the care of a physician during the entire time of disability but may be recovered if a simple disablement is removed by an efficient self-medical treatment.

I think the rule that should be applied here is best summarized in 1 Benedict § 83, p. 255—that the *unreasonable* leaving of the marine hospital disentitles the seaman to recover what the hospital would have supplied. The question here, as in Triantafilos, supra, is a close one but I resolve it in libellant's favor since (a) he was discharged and, although he returned the next morning, apparently he was not *apprised* that he would be readmitted; and (b) he shortly would have been put on an outpatient basis anyway. He will be allowed $6 per day (the stipulated amount) for the period from August 6, 1954, through December 3, 1956— 109 days. No further allowance will be made.[5]

2. Emphasis mine throughout unless otherwise indicated.

3. Elliott cites in support: The Saguache, 2 Cir., 112 F.2d 482 (where libellant left the Galveston Marine Hospital for one week without permission and later was discharged from two other hospitals for disciplinary reasons); Bowers v. Seas Shipping Co., 4 Cir., 185 F.2d 352 (where libellant rejected treatment and later sued for damages); Wassong v.

New York & Cuba Mail S. S. Co., 1942 A.M.C. 106.

4. Seville v. United States, 9 Cir., 163 F. 2d 296; Triantafilos v. United States, D.C.Pa., 87 F.Supp. 965, affirmed 3 Cir., 179 F.2d 399.

5. Dr. Barnes recommends a minor operation to remove a pin from libellant's hip but no doubt it would have been removed long ago at the Marine Hospital

## Damages

### As to the Carol Ann.

Libellant testified that he slipped on some object on the deck of the El Rancho which plunged him through the open hatch and into the hold. I cannot accept that testimony. At the same time I cannot find, as contended by respondents, that the way of ingress and egress over the decks of the vessels, at night, one with an open hatch and poor lighting, was safe, especially where there was notice, as here, that members of the crew of the Carol Ann were crossing and recrossing. I think libellant's fall into the hold and the resulting injuries were due in about equal proportions to (a) the lack of safe passage under all the circumstances; and (b) libellant's intoxication.

Libellant insists that the warranty of seaworthiness of a vessel, including as it does the duty to provide a safe place to work, extends to the mode of ingress and egress.[6] The Carol Ann recognizes that this is so but says that the mode of passage furnished here was reasonably safe for the purpose and that the obligation to furnish safe passage applies only to the vessel itself and appurtenances in the immediate area or vicinity and does not extend to an area over which the shipowner has no control, citing among other cases, Paul v. United States, 3 Cir., 205 F.2d 38, where a seaman fell into a pit on the dock area about 100 feet from the vessel. That was an action for negligence under the Jones Act, 46 U.S.C.A. § 688 in which Chief Judge Biggs strongly dissented. It was decided before Alaska Steamship Co., Inc., v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, affirming per curiam, 9 Cir., 205 F.2d 478, imposing strict liability upon an unseaworthy vessel regardless of fault or control of the instrumentality causing the injury.[7]

Here the Carol Ann was not moored alongside the dock as was the El Rancho; and the injury did not occur on the dock. *In order to get to the dock, or return,* libellant had to cross over the decks of two vessels with the hazards of an open hatch and insufficient lighting at night. This arrangement between the shipowners was the method chosen, and acquiesced in, by the shipowners and the vessels themselves in providing safe passage to the dock and back to the vessel. Thus each "out" vessel adopted the other for the purpose of safe passage. The "out" vessel may not have had the power of *control* of the other vessel but, having adopted the El Rancho as part of its own means for safe passage, the Carol Ann became liable, irrespective of control or knowledge of the conditions on the El Rancho.

While the Carol Ann's failure to inspect the means of passage, and her failure to provide a safe means of passage could be said to be negligence, this does not mean that the vessel was seaworthy since unseaworthiness can be created by negligence.[8]

### As to the El Rancho.

Since this is an in rem proceeding, libellant bases his right to recover from the El Rancho also on unseaworthiness, to which the same authorities generally are applicable as those cited in discussion of the Carol Ann; that is, that the El Rancho, under the custom pre-

---

if libellant had not left, or if he had applied for it.

6. Buch v. United States, D.C.N.Y., 122 F. Supp. 25 (where the injury resulted from a defective Jacob's ladder on the side of the vessel but furnished by a barge alongside); Pedersen v. United States, 2 Cir., 224 F.2d 212; Grillo v. Royal Norwegian Government, 2 Cir., 139 F.2d 237. These also were "Jacob's ladder" cases.

7. Citing Seas Shipping Co. v. Sieracki, 328 U.S. 85, 100, 66 S.Ct. 872, 90 L.Ed. 1099; Pope & Talbot Inc., v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143. See also Poignant v. United States, 2 Cir., 225 F.2d 595.

8. Cf. Poignant v. United States, supra; Grillea v. United States, 2 Cir., 232 F.2d 919.

vailing at Conn Brown Basin, whereby crews of outside vessels passed over the decks of the others, was unseaworthy for failure to provide reasonably safe passage to and from the outside vessel. I find that this is so under all the circumstances; that is, open hatch, inadequate lighting and knowledge that the Carol Ann crew members were crossing and re-crossing the El Rancho at night, or might do so.

El Rancho contends that libellant was a mere licensee who went on board at his own peril. Under the arrangement prevailing, however, libellant was an invitee to whom the El Rancho owed duties comparable to those in the Buch, Pedersen and Pope & Talbot cases (footnotes 7 and 8 supra). It may be that under certain circumstances, an open hatch would constitute neither negligence nor unseaworthiness, especially where the evidence is conflicting as to custom of leaving them open,[9] yet the reverse would be true irrespective of custom,[10] under the circumstances here—a vessel inviting and consenting to be used for safe passage to and from a dock by the crew of another vessel, at night and without adequate lighting. I hold the El Rancho equally liable with the Carol Ann for damages for unseaworthiness.

### The Damages.

 Libellant is 46 years old. He suffered very painful injuries which caused one leg to be shorter than the other. He has an overall medical disability of approximately 15 percent. I find his damages for loss of earning power, pain and suffering, etc., to be $17,500. His contributory negligence is not a bar to recovery[11] but will reduce the amount awarded to $8,750. Decree will be for this amount against both vessels and for $654 maintenance and cure against the Carol Ann alone.

The Clerk will notify counsel to submit an order accordingly.

9. Dwyer v. Nat'l Steamship Co., C.C., 4 F. 493; Ove Tysko v. Royal Mail Steam Packet Co., 9 Cir., 81 F.2d 960.

10. Cf. The T. J. Hooper, 2 Cir., 60 F.2d 737.

11. Pope & Talbot, Inc., v. Hawn, supra.