LAGOA, J.
Plaintiff Ciprian C. Flueras (“Mr.Fluer-as”), individually, and as the personal representative of the Estate of Diana Elena Flueras (“Ms. Flueras” or “Crew Member”), appeals from a final summary judgment entered in favor of defendant Royal Caribbean Cruises, Ltd. (“RCCL” or “Shipowner”) in an action alleging the unseaworthiness of RCCL’s vessel, the Explorer of the Seas, arising out of the alleged negligence of the vessel’s medical crew. Because genuine issues of material fact exist, we affirm in part and reverse in part.
I. FACTUAL AND PROCEDURAL BACKGROUND
Ms. Flueras was employed by Image Corp., The Image Group, or Image (collectively, “Image”), not by RCCL, as a photographer on the Explorer of the Seas.[1] On October 10, 2005, Ms. Flueras visited the ship’s infirmary complaining of back and abdominal pain. A nurse took her vital signs and conducted a preliminary assessment of her condition, which included a pregnancy test. The pregnancy test was positive. The ship’s senior physician, Dr. Geoffrey M. Harris, examined Ms. Flueras and diagnosed her as suffering from a “[f]lu-like illness.” Dr. Harris ordered Ms. Flueras to rest and return for follow-up on October 11. When Ms. Flueras returned the next day, she was seen by the ship’s junior physician, Dr. Anita Hostetter, who prescribed Tylenol to alleviate muscle pains. On October 12, Ms. Flueras was declared fit for duty.
On October 20, 2005, Ms. Flueras underwent an outpatient abortion procedure performed by Dr. Rupert Peterkin in St. Thomas, Virgin Islands. A letter of the same date from Dr. Peterkin to the “Ship’s Doctor” states that Dr. Peterkin informed Ms. Flueras that the amount of tissue removed during the procedure was inconsistent with her gestational age and that she should submit to further testing to rule out an ectopic pregnancy.
When Ms. Flueras returned to the ship on October 20, she visited the ship’s infirmary complaining of lower abdominal pain. *1105 At this time, Ms. Flueras’s vital signs were normal. She was attended by Dr. Harris, who noted she had undergone a termination procedure earlier that day and diagnosed her pain as post-operative. Dr. Harris prescribed Diclofenac, a painkiller, and ordered Ms. Flueras to return on October 22.
Ms. Flueras returned to the ship’s infirmary on October 21, complaining of pain. The nurse on duty consulted Dr. Harris over the phone and gave Ms. Flueras Ke-torolac, an intramuscular pain medication, and ibuprofen pursuant to Dr. Harris’s orders. The nurse instructed Ms. Flueras to return to the infirmary the next morning.
At 9:30 a.m. on October 22, Ms. Flueras returned for follow-up. Her vital signs were normal and Dr. Harris noted that her condition appeared to be improving. Upon examination, Dr. Harris found that Ms. Flueras’s abdomen was soft and bowel sounds were normal. Ms. Flueras continued to have lower abdominal pain and tenderness, especially on her right side, which Dr. Harris believed was in keeping with the termination procedure.[2] Dr. Harris again diagnosed her pain as post-surgical and ordered her to rest and return for follow-up the next day.
Between 11:00 and 11:15 a.m. on October 22, Ms. Flueras called her boyfriend, Davanathan Padmanaabhan, who was employed on the same vessel, and complained of pain and difficulty breathing. Mr. Pad-manaabhan went to Ms. Flueras’s cabin, where she told him she needed medical attention. Mr. Padmanaabhan testified that he immediately contacted the ship’s medical staff, who arrived with a wheelchair to bring Ms. Flueras to the infirmary.[3]
Ms. Flueras arrived at the infirmary at 12:30 p.m., in extremis, complaining of severe abdominal pain. She was attended by Dr. Harris, who noted that her blood pressure was unobtainable, her skin and conjunctiva were pale, and her lower abdomen was very tender.[4] Dr. Harris observed that Ms. Flueras’s condition was much deteriorated since he had examined her that morning: her pain was considerably worse and the bowel sounds that were present earlier were now absent. Dr. Harris diagnosed Ms. Flueras as suffering from a “catastrophic intraabdominal bleed” following a dilation and curettage abortion, and concluded that she needed surgical consultation immediately. The medical staff summoned an ambulance one minute after Ms. Flueras arrived.[5]
*1106 The entire medical staff of the vessel (three nurses and two doctors) attended Ms. Flueras while waiting for the ambulance to arrive. Ms. Flueras was administered pain medication and intravenous saline and Hetastarch, a compound that operates as “a blood substitute” by expanding the volume of plasma in the patient’s blood.
An ambulance manned by paramedics transported Ms. Flueras to Princess Margaret Hospital in Nassau, the hospital RCCL generally sends its crew for treatment.[6] Dr. Harris prepared a referral form to be delivered to the shoreside physician. The referral form read:
Had a therapeutic abortion 2 days ago in St Thomas. Sudden onset of pain at 11:30 today, with anemia and shortness of breath. Probable bleed/infection. In distress, please assess immediately.
Dr. Harris briefed the paramedics concerning Ms. Flueras’s condition and treatment. Dr. Harris did not contact the shoreside physician or other hospital personnel prior to Ms. Flueras’s arrival at the hospital; he believed the hospital had been notified by a paramedic or through the port agent. Dr. Harris ordered Nurse Ulla Bjorn to accompany Ms. Flueras in the ambulance to the hospital and to remain at the hospital until the vessel was scheduled to set sail several hours later. Nurse Bjorn was familiar with Ms. Fluer-as’s condition and was involved in her care and treatment. The ship’s deck log indicates that Ms. Flueras was “landed” at either 1:13 p.m. or 1:16 p.m.[7] Approximately forty-five minutes elapsed between the time Ms. Flueras arrived at the infirmary and the time she left the ship via ambulance.
When Nurse Bjorn returned to the ship, she gave a report concerning Ms. Flueras’s condition.[8] After the ship left Nassau, Dr. Harris received a letter from the port agent indicating that Ms. Flueras had a ruptured ectopic pregnancy and intra-ab-dominal bleeding. Ms. Flueras died at the shoreside hospital on October 24, 2005. The primary cause of death was septic shock and a ruptured ectopic pregnancy.
Mr. Flueras filed an action for unseaworthiness, alleging that RCCL’s vessel was unseaworthy because: (a) the vessel was unsafe and unfit as a consequence of RCCL’s conduct; (b) the vessel was manned by a medical crew that was not properly trained, instructed or supervised; (c) the vessel’s medical crew was unfit; (d) the vessel lacked adequate manpower for the tasks being performed; and (e) “[o]p-erational negligence existed in defendant’s inadequate medical care provided to Ms. Flueras; incompetent medical care provided to Ms. Flueras, and unfit medical crew caring for Ms. Flueras.” Subsequently, RCCL moved for summary judgment on the ground that Dr. Harris’s negligent conduct could not render the vessel unseawor-thy because Mr. Flueras failed to put Dr. Harris’s competence at issue. In response, Mr. Flueras argued that the crew members’ conduct and incompetency, as well as the absence of or failure to follow shipboard policies and procedures rendered RCCL’s vessel unseaworthy. Mr. Flueras also argued that the necessity for additional discovery precluded the entry of summary judgment.[9] The trial court *1107 heard the motion on October 18, 2007, reserved ruling, and ordered the parties to submit supplemental memoranda of law. The trial court subsequently granted RCCL’s motion for summary judgment and specifically found as follows:
The Court notes that the isolated negligent act of an individual crew member or employee does not render the ship unseaworthy. See, e.g., Usner v. Luckenbach Overseas, [Corp.], 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971). But see Olsen v. American Steamship Co., 176 F.3d 891 (6th Cir.1999).
This appeal ensued.
On appeal, Mr. Flueras argues that the entry of final summary judgment was erroneous as the conduct of the vessel’s medical staff, including Dr. Harris’s failure to properly diagnose Ms. Flueras’s ectopic pregnancy, during the three days following her shoreside abortion procedure constituted a “congeries of negligent acts” that rendered RCCL’s vessel unseaworthy. Mr. Flueras further argues that the vessel was unseaworthy because Dr. Harris and the vessel’s medical staff were unfit or incompetent crew members and because policies and procedures pertaining to medical care and emergent situations on board either did not exist or were not followed. Finally, Mr. Flueras argues that the entry of summary judgment was premature because discovery was incomplete.
RCCL limits its response to the narrow issue framed in its motion for summary judgment i.e., Dr. Harris’s competence, and argues that the trial court order is properly affirmed because the evidence that Dr. Harris was a fit and competent physician remains unrebutted. Proceeding from this premise, RCCL contends (without conceding) that Dr. Harris’s failure to diagnose Ms. Flueras’s ectopic pregnancy was an isolated act of medical negligence carried out by an otherwise competent physician, and therefore insufficient to render RCCL’s vessel unseawor-thy. RCCL further disclaims any duty to create policies or procedures governing medical emergencies on board its vessels, and concludes that discovery pertaining to this issue was irrelevant and would not have affected the trial court’s determination.
II. STANDARD OF REVIEW
Summary judgment is proper where “there is no genuine issue as to any material fact” and “the moving party is entitled to judgment as a matter of law.” Fla. R. Civ. P. 1.510(c). The Court reviews an order granting summary judgment de novo to decide whether, after drawing every inference in favor of the non-moving party, there is any genuine issue of material fact. If there is not, the Court must determine whether the movant is entitled to judgment as a matter of law. Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000); Bldg. Educ. Corp. v. Ocean Bank, 982 So.2d 37, 40 (Fla. 3d DCA 2008). In the context of seaworthiness, summary judgment may be granted “only where reasonable minds could not differ on the question of whether the unseaworthy condition of *1108 the vessel caused the plaintiffs injury.” Lane v. Tripp, 788 So.2d 351, 353 (Fla. 3d DCA -2001); see also Waggon-Dixon v. Royal Caribbean Cruises, Ltd., 679 So.2d 811, 813 (Fla. 3d DCA 1996).
III. SEAWORTHINESS
The maritime law of the United States[10] imposes an absolute, nondelegable duty upon a shipowner to furnish a seaworthy vessel. See generally Seas Shipping Co. v. Sieraeki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), superseded in part by statute, Longshoremen’s and Harbor Workers’ Compensation Act Amendments of 1972, Pub. L. No. 92-576, 86 Stat. 1263 (eliminating longshoreman’s cause of action for unseaworthiness), as recognized in Edmonds v. Compagnie Generate Transatlantique, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979); Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971); Cape Fear, Inc. v. Martin, 312 F.3d 496, 499 (1st Cir.2002). The shipowner’s duty is breached when a condition of the vessel, temporary or permanent, renders the vessel not reasonably fit for its intended use or service. Mitchell, 362 U.S. at 550, 80 S.Ct. 926; see Drachenberg v. Canal Barge Co., 571 F.2d 912, 918 (5th Cir.1978); Edy-nak v. Atl. Shipping, Inc., 562 F.2d 215, 222 (3d Cir.1977). If the unseaworthy condition is the proximate cause of a seaman’s[11] injury, the shipowner will incur liability to the seaman in an action for unseaworthiness under the general maritime law. E.g., Edynak, 562 F.2d at 222.
A vessel’s condition of unseaworthiness may arise from any number of circumstances:[12]
Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper. For any of these reasons, or others, a vessel might not be reasonably fit for her intended service.
Usner, 400 U.S. at 499, 91 S.Ct. 514 (footnotes omitted). E.g., Dos Santos v. Ajax Navigation Corp., 531 So.2d 231 (Fla. 3d DCA 1988) (butter on floor of vessel’s kitchen area), cert. dismissed, 489 U.S. 1048, 109 S.Ct. 1304, 103 L.Ed.2d 574 (1989); Lane, 788 So.2d 351 (wet foot rest); Drachenberg, 571 F.2d 912 (marine unloading arm defective); Stevens v. Seacoast Co., 414 F.2d 1032 (5th Cir.1969) (vessel unequipped with radio and certain medical supplies); In re Ta Chi Navig. (Pan.) Corp., 513 F.Supp. 148 (E.D.La. *1109 1981) (incompetent crew), aff'd, 728 F.2d 699 (5th Cir.1984); Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955) (incompetent seaman); Hercules Carriers, Inc. v. Fla. Dep’t of Transp., 768 F.2d 1558 (11th Cir.1985) (failure to comply with established policies rendered crew unfit); Morel v. Sabine Towing & Transp. Co., 507 F.Supp. 949 (E.D.Tex.1981) (inadequate crew and medical care), aff'd, 669 F.2d 345 (5th Cir. 1982); Edynak, 562 F.2d 215 (improper method of unloading); Bradshaw v. The Carol Ann, 163 F.Supp. 366 (S.D.Tex.1956) (unseaworthy mode of ingress and egress); Deal v. A.P. Bell Fish Co., 674 F.2d 438 (5th Cir.1982) (inexperienced crew member not instructed in use of life preserver); Smith v. Ithaca Corp., 612 F.2d 215 (5th Cir.1980) (toxic concentration of benzene fumes in crew living and working areas), abrogated on other grounds by Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988).[13]
At the same time, it is well settled that only a “condition” renders a ship un-seaworthy, and that isolated, personal negligent acts are categorically excluded as a basis for liability on the part of the shipowner. Usner, 400 U.S. at 500, 91 S.Ct. 514; see also Edynak, 562 F.2d at 224 (“[U]nseaworthiness is a condition, not an act.”); Daughdrill v. Ocean Drilling & Exploration Co., 709 F.Supp. 710, 712 (E.D.La.1989) (“[A] vessel is not deemed unseaworthy because of an isolated act of the crew, for that would destroy the distinction between unseaworthiness and negligence.”). This distinction operates as perhaps the most severe limitation on the doctrine of unseaworthiness. Cf. Franklin v. Doric Shipping & Trading Corp., 357 F.Supp. 1132, 1135 (W.D.La.1972) (stating that if an unseaworthy condition results in a seaman’s injury, the shipowner is liable “no matter how the condition was brought about or who brought it about”), aff'd, 477 F.2d 594 (5th Cir.1973); Harper v. Falrig Offshore, Inc., 2000-694 (La.App. 3 Cir. 12/20/00); 776 So.2d 620 (“In determining whether a vessel is seaworthy or not, all that is necessary is that there be some defective condition of the vessel that caused the injury.”); Vendetto v. Sonat Offshore Drilling Co., 97-3103 (La.1/20/99); 725 So.2d at 482 (“[T]he mere fact that an accident occurred does not establish unseaworthiness.”).
Finally, unseaworthiness is generally a question of fact reserved for the jury. Brown v. Teresa Marie IV, Inc., 477 F.Supp.2d 266, 274 (D.Me.2007) (quoting Jordan v. U.S. Lines, Inc., 738 F.2d 48, 50 (1st Cir.1984)); Waggon-Dixon, 679 So.2d at 813 (“The question of unseaworthiness is ordinarily one for the jury and only in a rare case can a vessel be unseaworthy as a matter of law.” (quoting Johnson v. Bryant, 671 F.2d 1276, 1279 (11th Cir. 1982))).
A. Competency of Dr. Harris and the Vessel’s Medical Crew
Mr. Flueras argues that Dr. Harris and the vessel’s medical staff were unfit and incompetent, and therefore RCCL’s vessel was unseaworthy. Mr. Flueras relies on *1110 the affidavits of Douglas Shields, M.D., and James A. Greenberg, M.D., to support his argument.
Dr. Shields averred: (1) that it is “prudent procedure and practice” for medical personnel to contact and gather missing medical records and recommendations for follow-up care; (2) that in an emergent evacuation of a patient in critical condition, “reasonable and prudent practice” requires direct communication between the ship’s doctor and the shoreside hospital and physician,[14]- and that a copy of the entire medical record arrive at the receiving hospital before or with the patient;[15] (3) that Dr. Harris and the vessel’s medical personnel failed in each of these respects; and (4) that the medical records kept by Dr. Harris and the medical crew failed to fully and adequately document the course and timing of the treatment provided Ms. Flueras.
Dr. Greenberg averred that Dr. Harris: (1) should have ruled out an ectopic pregnancy, given Ms. Flueras’s symptoms; and (2) failed to request or gather any information from Dr. Peterkin related to Ms. Flu-eras’s shoreside abortion procedure.
RCCL responds that, at most, Mr. Flu-eras’s allegations support the conclusion that Dr. Harris was “a very competent and fit ship’s physician who exhibited what would have to [be] characterized as an alleged momentary lapse in judgment.” In support, RCCL offers Dr. Harris’s resume as proof of his competence and highlights the following qualifications that Dr. Harris (1) has practiced medicine for more than thirty-three years, (2) is Board certified in emergency medicine and most recently passed a decennial exam in September 2005, (3) had four and one-half years of experience working onboard cruise ships at the time he treated Ms. Flueras, and (4) knew and recognized the symptoms of an ectopic pregnancy and had treated the condition in the past.
The shipowner’s warranty of seaworthiness extends to the vessel’s crew. Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 726-27, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967); Waggoiu-Dixon, 679 So.2d at 813 (“[A] shipowner’s duty to ensure that its vessel is seaworthy encompasses the obligation to provide a competent crew for the vessel.”); Hercules, 768 F.2d at 1565-66. The shipowner breaches this duty by manning the vessel with an unfit, incompetent, inadequate, defective, or improperly trained or supervised crew. Brogan v. United N.Y. Sandy Hook Pilots’ Ass’n, 213 F.Supp.2d 432, 438 (D.N.J.2002) (recognizing warranty may be breached by provision of inadequate or improperly trained crew); Comeaux v. T.L. James & Co., 666 F.2d 294, 299 (5th Cir.1982) (crew insufficient in number and inadequate because one crew member was inexperienced and blind in one eye), supplemented, 702 F.2d 1023 (5th Cir.1983); Hogge v. SS. Yorkmar, 434 F.Supp. 715, 736-37 (D.C.Md.1977) (pilot that lacked knowledge and misunderstood local custom was incompetent); Pradarits v. Capital Towing Corp., 710 So.2d 334, 337 (La.App. 4 Cir.1998) (crew must be “adequate in number and competent in duties”); Waggon-Dixon, 679 So.2d at 813 (failure to proper *1111 ly train or supervise crew may result in unseaworthy condition).
The crew need not be competent to meet all contingencies, Boudoin, 348 U.S. at 337, 75 S.Ct. 382, and the crew’s incompetence or unfitness must “rise to the level of a hazard of the vessel” to produce the requisite unseaworthy condition, Ward v. Union Barge Line Corp., 443 F.2d 565, 571 (3d Cir.1971), overruled on other grounds by Cox v. Dravo Corp., 517 F.2d 620 (3d Cir.1974). But see Bommarito v. Penrod Drilling Corp., 929 F.2d 186, 190 (5th Cir.1991) (finding “hazard” language too strong), abrogated on other grounds, Vendetto, 725 So.2d at 478. A condition of a crew member (or a group thereof) rendering him “[1] not fit for his ordinary duties or [2] not up to the ordinary standards of his profession” is an unseaworthy condition sufficient to warrant the imposition of liability on the shipowner. Hogge, 434 F.Supp. at 736; Mitola v. Johns Hopkins Univ. Applied Physics Lab., 839 F.Supp. 351, 358 (D.Md.1993).
An isolated, negligent act performed by an otherwise competent crew member is not a condition of the vessel and does not render the ship unseaworthy. Hogge, 434 F.Supp. at 736; Mitola, 839 F.Supp. at 358. Hogge involved the collision of a vessel with the vertical lift span of a railroad bridge located in a channel to which access by boat was controlled. Hogge, 434 F.Supp. at 723. One of the plaintiffs, a seaman injured in the collision, claimed the vessel was unseaworthy because the ship’s local pilot and captain were incompetent. Id. at 735-36. The evidence showed that the pilot lacked knowledge of the customary requirements for passage through the channel, misunderstood the customary significance of obtaining “clearance” to enter the channel, and failed to realize custom required that he contact personnel controlling the bridge by radio or some other method. Id. at 736. Therefore, the pilot lacked “sufficiently precise knowledge of the customary law of a particular waterway[,] a knowledge that the ordinary canal pilot should have.” Id. The court concluded that the pilot’s conduct was sufficient to amount to a condition rendering the vessel unseawor-thy. Id. at 736-37.
However, in Mitola, the court concluded that the decision of a ship’s captain to steer the vessel through the eye of a hurricane was a personal act of negligence undertaken by an otherwise competent crew member, and therefore, insufficient to produce a condition of the vessel rendering it unseaworthy. Mitola, 839 F.Supp. at 359. To support its conclusion, the court noted that the plaintiff (a researcher onboard the vessel when it navigated the hurricane) alleged only that the captain’s decision was “imprudent” and wholly failed to produce evidence that the captain’s degree of skill or knowledge rendered him incompetent and the vessel unseaworthy. Id. Moreover, the plaintiff in Mitola admitted there was no “unsafe condition” of the vessel that caused or contributed to his injury, and did not claim that the vessel lacked necessary safety equipment, or that such equipment was improperly stowed. Id. at 357. Thus, the court entered summary judgment in favor of the shipowner. Idl at 359.
Nevertheless, “[although a single incident of negligence is certainly not conclusive evidence of crew incompetence, such evidence is probative.” Brogan, 213 F.Supp.2d at 439 (citing In re Potomac Transp., Inc., 909 F.2d 42, 47 (2d Cir.1990)). Courts seeking to distinguish mere error from crew incompetency have distinguished the act (error) from the condition (incompetence) by considering each as occupying opposite ends on a crew performance continuum:
*1112 The actual conduct of such an incompetent crew which is the cause of the damage may involve the navigation or management of the vessel; nonetheless if incompetence results in a navigational error which causes the collision, it is crew incompetence, and therefore the unseaworthiness of the vessel, which has caused the ... damage. The fact that the unseaworthiness can be labeled as an error in navigation does not magically protect the shipowner from liability. At some point along a spectrum of performance competency, an error in navigation is attributable to incompetence on the part of the crew.
Ta Chi, 518 F.Supp. at 158; Hercules, 768 F.2d at 1577 (quoting Ta Chi). Thus, “the fact that the [ship’s] physician errs in his treatment does not prove that he was incompetent,” Barbetta v. S/S Bermuda Star, 848 F.2d 1364, 1374 n. 3 (5th Cir. 1988) (passenger case) (quoting Amdur v. Zim Israel Navigation Co., 310 F.Supp. 1033, 1042 (S.D.N.Y.1969)), but the error tends to make an inference of incompetence more probable. Hercules, 768 F.2d at 1577.
The heart of the analysis in these cases is the crew member’s specific knowledge, degree of skill, sufficiency of experience, and/or adequacy of licensure, and the affidavits produced by Mr. Flueras fail to directly challenge these aspects of Dr. Harris’s qualifications. For example, Dr. Greenberg does not contend that Dr. Harris lacked knowledge of the symptoms of an ectopic pregnancy; rather, Dr. Green-berg opines that Dr. Harris failed to follow standard diagnostic procedure by ruling out the possibility that Ms. Flueras was suffering from an ectopic pregnancy.[16] See Hogge, 434 F.Supp. at 736 (incompetent pilot lacked knowledge of customary law of particular waterway). While Dr. Harris has less than five-years experience practicing medicine on cruise ships, see Ta Chi, 513 F.Supp. at 160 (incompetent captain had only three years experience), Dr. Harris had extensive experience in emergency medicine (more than twenty years) and thus, comparison with crew members found competent is more appropriate, see id. (noting twenty years experience sufficient to rebut presumption of incompetence in other cases). In addition, Dr. Shields’s use of the term “prudent” to describe certain practices Dr. Harris should have engaged in recalls the use of the word “imprudent” in Mitola. See Mi-tola, 839 F.Supp. at 359 (captain’s decision to drive through hurricane may have been “imprudent” but did not render him incompetent). Thus, the affidavits submitted by Mr. Flueras strongly corroborate the general nature of the allegations that Dr. Harris provided negligent diagnosis and treatment to Ms. Flueras, but not that Dr. Harris was incompetent or unfit.
Because Dr. Harris’s licensure, experience, knowledge, and skill remain unrebut-ted by the affidavits, Mr. Flueras has failed to prove the existence of a triable issue that would have precluded summary judgment, as to whether Dr. Harris was “not fit for his ordinary duties or not up to the ordinary standards of his profession.” [17] Hogge, 434 F.Supp. at 736; see also Mitola, 839 F.Supp. at 358. The trial court’s entry of summary judgment therefore must be affirmed on this issue.
*1113 Mr. Flueras, however, also alleges that the vessel’s other medical personnel were unfit or incompetent. The expert affidavits are insufficient to put the medical crew’s competence at issue for reasons set forth above; however, Mr. Flueras has not had the benefit of discovery with respect to the licensure, experience, knowledge, and skill of the other medical personnel onboard RCCL’s vessel. Because future discovery might yield information supporting the conclusion that the ship’s junior doctor or nurses were incompetent, or unfit and the vessel therefore was un-seaworthy, the entry of summary judgment on this issue was premature.
B. Policies and Procedures
Mr. Flueras raises two arguments with respect to shipboard policies and procedures: (1) if RCCL failed to promulgate policies and procedures to govern medical care and emergency evacuations onboard its vessel, then the absence of such regulations rendered the vessel unseaworthy; and (2) if policies and procedures existed, then the crew’s failure to comply with them rendered the crew incompetent and the vessel unseaworthy.
1. Absence of Policies and Procedures
Mr. Flueras contends that the following regulations did not exist on RCCL’s vessel: (1) a policy requiring the vessel’s medical staff to obtain missing medical records and/or recommendations for follow-up care from the patient or the shore-side physician in situations where a crew member undergoes a shoreside procedure under the supervision of another physician; and (2) a policy requiring direct communication between the ship’s doctor and the receiving hospital and physician, as well as transmission of the patient’s entire medical record, in emergent medical evacuations. Mr. Flueras contends that RCCL had a duty to promulgate such policies and procedures, and that the failure to do so rendered the vessel unseaworthy.
RCCL argues that it is under no duty to establish such regulations governing the conduct of the ship’s doctor and medical crew. The cases relied upon by RCCL absolving the shipowner of such responsibility involve passengers, not crew members. In the passenger context, it is well settled that, if a shipowner undertakes to employ a doctor onboard his vessel for the care of passengers, the doctor’s negligence will not be imputed to the shipowner.[18] See, e.g., Barbetta, 848 F.2d at 1369; Carnival Corp. v. Carlisle, 953 So.2d 461, 471 (Fla.2007) (shipowner is not liable to passengers for the medical negligence of ship’s doctor). But see Nietes v. Am. President Lines, Ltd., 188 F.Supp. 219, 220 (N.D.Cal.1959) (imputing liability where ship’s doctor is in the regular employ of the ship, subject to ship’s discipline and captain’s orders, and under general direction and supervision of company’s chief surgeon). As the court in Barbetta stated:
In the case of a ship’s doctor ... the carrier or ship owner lacks both (1) the expertise to meaningfully evaluate and, therefore, control a doctor’s treatment of his patients and (2) the power, even if it had the knowledge, to intrude into the physician-patient relationship.
Barbetta, 848 F.2d at 1371.
This rationale provided the foundation for the decision in Hajtman v. NCL (Bahamas) Ltd., 526 F.Supp.2d 1324, 1327 (S.D.Fla.2007), in which the court held that the defendant shipowner was not required to establish or enforce “particular medical directives regarding patient care.” In Hajtman, the plaintiff passenger argued *1114 that the shipowner was negligent in failing to establish and enforce policies and procedures ensuring that passengers falling ill onboard have access to the ship’s doctor, are not prevented from obtaining medical cáre, and are not left unattended. Id. The court held that the shipowner lacked the expertise necessary to supervise medical personnel and create medical guidelines, and therefore, that it would be imprudent to require the shipowner to promulgate regulations pertaining to patient care; rather, policies and procedures of this sort should be developed by individuals with medical training.[19] Id.
The reasoning in Hajtman and similar cases is consistent with the fact that the shipowner-passenger relationship, including the shipowner’s liability to passengers, is governed by the terms of its contract of passage. See Barbetta, 848 F.2d at 1366, 1372 (shipowner not vicariously liable for ship doctor’s negligence where contract of passage disclaimed responsibility for physician’s omissions, negligence, or damage to passenger). As a result, the shipowner can disclaim or assume the obligations pertaining to the medical care of the vessel’s passengers, including, for example, the duty to implement shipboard policies and procedures, by expanding or constricting its contractual duties. See id.
In contrast, the warranty of seaworthiness a shipowner owes to its seamen is absolute, non-delegable, and cannot be disclaimed. See Sieracki, 328 U.S. at 94-95, 100, 66 S.Ct. 872; Mitchell, 362 U.S. at 549, 80 S.Ct. 926. That being said, the only case presented to this Court that discusses the possibility of seaworthiness as it relates to the duty to promulgate a policy or procedure is Daughdrill, 709 F.Supp. at 713.
In Daughdrill, a drilling rig employee was injured while egressing the rig in a personnel basket suspended from a crane in rough weather, and alleged the unseaworthiness of the rig by virtue of the shipowner’s failure to establish an express policy prescribing a method for determining the appropriate way to transfer crew members on and off the rig, for instance, by crew boat, helicopter, or personnel basket. Daughdrill, 709 F.Supp. at 711, 713. The testimony at trial indicated that the crew’s general practice was not to perform crew transfers by crane and personnel basket in winds over forty-five miles per hour, and that the decision to offload by crane in seas less than ten feet was based on the ability of the captain to control the receiving crewboat and whether the sea had choppy waves or ground swells. Id. at 713. The court noted that “within certain guidelines customarily applied by the company’s men, the method employed to perform the crew transfer is made on a case by case basis,” and concluded there was no evidence that the absence of an express policy rendered the vessel unseaworthy. Id. The court pointed out:
If [co-defendant seeking indemnity] intended to pursue this unseaworthiness defense, it could, for example, have called a safety expert to testify that the lack of a company policy rendered the crew unfit. In addition, there was no evidence at trial of repeated injuries to crew members resulting from personnel transfers by crane and crewboat, as would be necessary for an absence of policy to constitute an unseaworthy condition.

Id.

Neither party nor this Court has identified any other federal or state court case *1115 considering this issue in general, much less a seaworthiness case imposing such an affirmative duty upon a shipowner to promulgate medical policies or procedures. We note that, although the shipowner-passenger and the shipowner-seamen relationships spring from different responsibilities and are different in their scope, the competency, expertise, and patient privacy concerns courts have articulated in the passenger content have application here as well. We therefore decline to extend the law in this context, and we affirm the trial court’s grant of summary judgment on this issue of whether RCCL had an affirmative duty to promulgate such policies and procedures.
2. Failure to Follow Established Policies or Procedures
Our conclusion that the warranty of seaworthiness does not impose such an obligation does not, however, apply where a shipowner has chosen to promulgate relevant policies and procedures. Indeed, the shipowner’s duty to furnish a seaworthy vessel extends to “the procedures crew members are instructed to use for assigned tasks.” Cape Fear, 312 F.3d at 500; see also Brown, 477 F.Supp.2d at 272. Where the shipowner has established a policy or procedure to govern one or more functions of the vessel’s crew, failure to comply with the policy may result in liability, particularly if the crew instead engaged in an improper or unsafe method of work. E.g., Hercules, 768 F.2d at 1573; see Brown, 477 F.Supp.2d at 273 (“[T]he procedures used by a crew can, in and of themselves, create an unseaworthy condition[.]”).[20] In Broum, the subject vessel sank in fair weather on the return trip from a fishing expedition. Brown, 477 F.Supp.2d at 269. A seaman injured in the incident sued the shipowner, alleging the vessel was overloaded and therefore, unseaworthy. Id. at 272. The seaman’s expert contended that, on the return journey, the distance from the water line to the deck of the vessel was in violation of the distance prescribed in the ship’s “stability booklet,” which “contained instructions and diagrams regarding the proper manner to load the vessel to maintain stability.” Id. Plaintiffs expert further testified that, for the vessel to sit so low in the water after being loaded with fish, the ballast tanks must have been full. Id. at 273. The stability booklet required the crew to empty the ballast tanks in this situation. Id. The court concluded that triable issues of fact existed, precluding summary judgment of the plaintiffs allegations of overloading. Id. at 272-73; see also Cape Fear, 312 F.3d at 502 (sufficient evidence to create a question of fact as to the unseaworthiness of the vessel by reason of overloading where the evidence indicated, among other things, that the vessel was operated contrary to stability book).
Mr. Flueras relies primarily on Hercules to support his argument that the medical crew’s failure to comply with established shipboard policies, if they existed, rendered the crew incompetent and produced a condition of unseaworthiness. See Hercules, 768 F.2d at 1558. Hercules involved the collision of a vessel with a bridge; the shipowner sought limitation of liability, but the claim failed due (in part) to a finding that the ship was unseaworthy because the ship’s crew failed to comply with the shipowner’s written policies and *1116 other binding regulations. Id. at 1570-73. Specifically, the ship’s captain failed to ensure that the vessel’s anchors were ready for use upon entering and leaving port “as a matter of practice for the past 15 years” in violation of company regulations, id. at 1570, failed to follow established procedures governing turnover on the bridge, id. at 1571, and ignored written company policy in favor of an informal and unofficial shipboard practice that permitted the captain to defer responsibility for the safety of the ship to the navigating pilot, id. at 1572-73. Discussing the failure to observe proper turnover procedures, the court pointed out:
Had the two officers gone through the appropriate turnover procedures, a discussion of the ship’s speed and course along with the presence of other vessels and the location of the bridge would obviously have occurred ... The failure to follow established procedures for turnover on the bridge resulted in critical communications never being exchanged — communications that very well may have averted the accident.
Id. at 1571. In addition, the circuit court affirmed the district court’s conclusion that the captain’s failure to instruct, train, or disseminate to the crew information pertaining to company or other binding regulations likewise rendered the crew incompetent and the vessel unseaworthy. Id. at 1573.
The difficulty here is that Mr. Flueras was not provided the benefit of discovery with respect to shipboard medical policies and procedures, although there is some evidence they exist.[21] Mr. Flueras sought to depose Vince Warger, RCCL’s Director of Claims and Medical Services, on this issue; however, RCCL moved for a protec-five order, arguing that “whether [RCCL] had ‘coherent policies and procedures’ and whether the shipboard medical personnel followed [RCCL’s] policies and procedures in the treatment of Diana Flueras is irrelevant,” which the trial court granted. RCCL’s argument is contrary to Hercules, Brown, and Cape Fear. In each of these cases, the crew’s failure to comply with pertinent policies and/or regulations rendered the crew incompetent, and the vessel unseaworthy (or, at the least, gave rise to a triable issue of fact). See Hercules, 768 F.2d at 1570-73; Brown, 477 F.Supp.2d at 272-73; Cape Fear, 312 F.3d at 502.
Because Mr. Flueras has not had the benefit of discovery regarding the existence of shipboard policies and procedures and whether the crew here complied with them, the entry of summary judgment on this issue was premature. See Payne v. Cudjoe Gardens Prop. Owners Ass’n, 837 So.2d 458, 461 (Fla. 3d DCA 2002).
C. Congeries of Acts Amounting to an Unseaworthy Condition
Mr. Flueras argues that Ms. Flueras’s several visits to the ship’s infirmary between October 20 and 22, 2005, in combination with the conduct of the vessel’s other medical staff, constituted an aggregation or congeries of negligent acts that rendered RCCL’s vessel not reasonably fit for its intended use or service and therefore, unseaworthy. Because (1) we hold that Mr. Flueras’s inability to discover certain information regarding existing medical policies and procedures and the competency of RCCL’s medical crew other than Dr. Harris rendered the trial court’s final summary judgment premature, and (2) the “congeries of acts” alleged by Mr. Flueras *1117 includes the conduct of the vessel’s medical crew other than Dr. Harris and their compliance with existing medical policies and procedures, we likewise hold that final summary judgment on this theory was premature. Nevertheless, we provide the following exposition of the law as it pertains to Mr. Flueras’s “congeries of acts” argument for the purpose of aiding the trial court’s analysis of the theory on remand.
Courts have carefully and frequently distinguished liability founded on unseaworthiness from liability founded on negligence. Usner, 400 U.S. at 498, 91 S.Ct. 514; see also Ryan v. Pac. Coast Shipping Co., 509 F.2d 1054, 1056 (9th Cir.1975); Adams v. Ugland Mgmt. Co., 515 F.2d 89, 90 (9th Cir.1975); Edynak, 562 F.2d at 224; Daughdrill, 709 F.Supp. at 712. As stated by the United States Supreme Court:
To hold that this individual act of negligence rendered the ship unseaworthy would be to subvert the fundamental distinction between unseaworthiness and negligence that we have so painstakingly and repeatedly emphasized in our decisions. In [Mitchell v. Trawler Racer, [362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960) (wherein plaintiff slipped on foot rail covered with fish slime and gurry) ], there existed a condition of unseaworthiness, and we held it was error to require a finding of negligent conduct in order to hold the shipowner liable. The case before us [plaintiff was injured when winch operator negligently lowered loading apparatus] presents the other side of the same coin. For it would be equally erroneous here, where no condition of unseaworthiness existed, to hold the shipowner liable for a third party’s single and wholly unforeseeable act of negligence.
Usner, 400 U.S. at 500, 91 S.Ct. 514 (footnotes omitted).
Nevertheless, while an isolated, personal act of negligence[22] is neither necessary nor sufficient to establish the unseaworthiness of the vessel, a series of negligent acts may combine to give rise to an unseaworthy condition. See Robinson v. Showa Kaiun K.K., 451 F.2d 688, 690 (5th Cir.1971) (negligence can create an unseaworthy condition); Daughdrill, 709 F.Supp. at 712 (same); Edynak, 562 F.2d at 224 (shipowner can be liable for negligence if it “amounts to more than an isolated act and creates a condition of the vessel”); Mitola, 839 F.Supp. at 358. As the Fifth Circuit explained in Robinson:
Usner distinguished “instantaneous” unseaworthiness from what might be called “connected” unseaworthiness. A longshoreman or one of his fellows might engage in a congeries of negligent acts that are of such a character or that continue for such a length of time that they become related to the status of the vessel. That congeries of acts might create a ‘condition’ of unseaworthiness, so that an individual act of negligence within or after the congeries might give rise to liability under the unseaworthiness doctrine. However, if the negligent act of a longshoreman is not part of any congeries of negligent acts connected to the status of the vessel or to its loading but is rather an isolated “instantaneous” act of negligence within an otherwise seaworthy method of loading on an otherwise seaworthy vessel, then that one act of negligence by the longshoreman or his fellows will not render the vessel unseaworthy.
*1118 Robinson, 451 F.2d at 690. This interpretation of Usner is widely accepted. See Edynak, 562 F.2d at 224; Daughdrill, 709 F.Supp. at 712; Mitola, 839 F.Supp. at 358; Crane v. Diamond Offshore Drilling, Inc., 99-166 (La.App. 5 Cir. 9/15/99); 743 So.2d 780, 790.
To facilitate the determination of condition versus isolated act, courts have made two important observations: first, an act is instantaneous, while there must be some period of time during which a condition exists; and second, a condition necessarily involves more than one act. Edynak, 562 F.2d at 224; Ryan, 509 F.2d at 1057 n. 6 (adding that period of time must be longer than a few seconds or minutes). Likewise, where the facts indicate that negligence was pervasive or repetitive, such that it would constitute an unsafe or improper work method, courts are more likely to find a condition instead of an isolated act.[23] Daughdrill, 709 F.Supp. at 712 (no condition where negligent act occurred only one or two other times in preceding ten years); Edynak, 562 F.2d at 225 (negligent lowering of crane bucket on five to six other occasions in past two days could be improper method and rose to level of condition); Ryan, 509 F.2d at 1057 (no condition where conduct did not occur for six shifts prior to accident and did not happen again); see also Harper, 776 So.2d at 628; Vendetto, 725 So.2d at 481 (“[O]p-erational negligence must be ‘pervasive’ or repeated frequently for it to rise to the level of an unseaworthy condition as in an ‘improper method of operation.’ ”).
IV. CONCLUSION
Accordingly, for the reasons stated above, we affirm in part and reverse in part the trial court’s entry of final summary judgment in favor of RCCL.
Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

. Mr. Flueras, as Ms. Flueras's personal representative, is also suing Image for negligence on substantially the same facts summarized herein under the Jones Act, 46 U.S.C.A. § 688 (West 1982), currently codified at 46 U.S.C.A. § 30104 (West 2011).

. At his deposition, Dr. Harris testified that an ectopic pregnancy is included in the differential diagnosis of a young woman complaining of abdominal pain. Because Ms. Flueras had recently undergone an abortion by dilation and curettage, Dr. Harris concluded that the possibility of an ectopic pregnancy was "very, very slim.”

. Mr. Padmanaabhan did not indicate what time he contacted the ship's medical staff. Dr. Harris testified that the medical staff was not made aware of Ms. Flueras’s situation until after 11:30 a.m., and went to see her as soon as the call was made.

. An unobtainable blood pressure indicates the patient is in shock. Pale conjunctiva (the parts of the eyelid that are usually red) indicate bleeding, anemia, or low blood pressure or hemoglobin.

.The ship’s deck log indicates the ship was cleared in port at Nassau, Bahamas at 11:33 a.m. on October 22. Because the ship was docked, an ambulance was called to transport Ms. Flueras to a shoreside hospital. According to Dr. Harris’s testimony, if the vessel had not been in port, Ms. Flueras would have been transported to a shoreside hospital via helicopter, or the vessel would have put in at the nearest port. However, when a ship is docked, ”[t]he fastest way to get the patient to the hospital is by ambulance.”

. Passengers are generally sent to Doctor's Hospital in Nassau.

. The last digit in the time recorded in the ship's deck log is barely legible; Dr. Harris testified that the time read either 1:13 p.m. or 1:16 p.m.

. Nurse Bjorn reported that the shoreside hospital had difficulty finding their ultrasound equipment, which delayed Ms. Flueras’s treatment.

. The discovery sought by the plaintiff included: (1) requests for production directed to RCCL and third parties pertaining to policies and procedures for dealing with crew mem *1107 ber emergencies, medical records from the shoreside hospital, information from the Nassau port agent, and agreements between the shoreside hospital and shipowner; (2) depositions including the ship’s junior doctor and three nurses, the Nassau port agent, ambulance driver and paramedics, and RCCL’s Vince Wager, Director of Claims and Medical Services; and (3) requests for admission directed to RCCL. A motion for protective order seeking to prevent the deposition of Mr. Wager was also pending. The protective order was sought on the grounds that Mr. Wager had no personal knowledge of the circumstances of Ms. Flueras's injury and other representatives of RCCL were qualified to testify regarding shipboard policies and procedures, if relevant.

.The substantive law that governs an action for unseaworthiness is the general maritime law of the United States, developed by courts sitting in admiralty. See Kermarec v. Compag-nie Generate Transatlantique, 358 U.S. 625, 629, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 864, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); Hallman v. Carnival Cruise Lines, Inc., 459 So.2d 378, 379 (Fla. 3d DCA 1984) ("[W]hile the plaintiffs are clearly entitled to sue in state courts for damages arising from maritime torts accruing on navigable waters in this country, maritime law is the substantive law to be applied irrespective of where the action is brought.”).

. The warranty of seaworthiness extends only to seamen. A shipowner owes no duty of seaworthiness to passengers or to others on board for a purpose other than to perform the ship’s work. Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1335 (11th Cir. 1984) (passengers); Kermarec v. Compagnie Generate Transatlantique, 358 U.S. 625, 629, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959) (persons not performing ship’s work).

. Accordingly, ”[w]hether a vessel is unsea-worthy is a factual question to be decided on a case-by-case basis.” Vendetto v. Sonat Offshore Drilling Co., 97-3103 (La. 1/26/99); 725 So.2d 474, 481.

. Liability under the doctrine of unseaworthiness is not dependent upon the shipowner's actual or constructive knowledge of an unsea-worthy condition, Mitchell, 362 U.S. at 549, 80 S.Ct. 926, nor does liability depend upon fault. Sieracki, 328 U.S. at 93-94, 66 S.Ct. 872. In addition, the shipowner’s duty to furnish a seaworthy vessel is completely independent of his duty to exercise reasonable care under the Jones Act. Mitchell, 362 U.S. at 549, 80 S.Ct. 926; Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1354 (5th Cir. 1988). The duty to provide a seaworthy vessel is not mitigated or discharged by the exercise of reasonable care or due diligence. Saleh v. United States, 849 F.Supp. 886, 893-94 (S.D.N.Y.1994).

. In his affidavit, Dr. Shields averred that the medical crew's failure to communicate directly with the receiving hospital or physician resulted in or exacerbated the hospital’s difficulty locating ultrasound equipment when Ms. Flueras arrived. Ultrasound equipment is “crucial” to the diagnosis of a patient suffering from an ectopic pregnancy.

. In his affidavit, Dr. Shields averred that the medical crew's failure to provide a full and complete medical record to the receiving hospital (sending, instead, the referral form prepared by Dr. Harris) was a "gross deviation from [the] accepted standard of care” in emergency and cruise ship medicine.

. Thus, the fact that Dr. Harris recognized the symptoms of an ectopic pregnancy remains unrebutted.

. Mr. Flueras also makes the argument that discovery was "limited and incomplete” with respect to Dr. Harris’s qualifications, and future discovery might yield evidence of past claims of malpractice. This argument is unpersuasive because, unlike the vessel’s other medical personnel, Mr. Flueras deposed Dr. Harris and failed to inquire regarding prior allegations of malpractice.

. The rule is to the contrary when the doctor is employed for the purpose of treating the ship’s seamen; in that situation, the Jones Act makes the shipowner liable to seamen for the doctor’s negligent treatment. Barbetta, 848 F.2d at 1369 n. 1.

. The court in Hajtman also extended the shipowner's protection from vicarious liability to the vessel’s nurses and medical staff, as well as to the ship’s doctor. Hajtman, 526 F.Supp.2d at 1327 n. 1.

. In contrast, demonstrated compliance with relevant policies, procedures, regulations, statutes, and/or industry practices is not pri-ma facie evidence of seaworthiness. Smith, 612 F.2d at 219; Johnson, 845 F.2d at 1355; cf. Moreno v. Grand Victoria Casino, 94 F.Supp.2d 883, 892 (N.D.Ill.2000) ("[T]here are precautions so imperative that even their universal disregard will not excuse their omission.” (quoting The T.J. Hooper, 60 F.2d 737 (2d Cir.1932) (Hand, J.))).

. RCCL alleges that it "met and exceeded the requirements of tire American College of Emergency Physicians Health Care Guidelines on Cruise Ship Medical Facilities” and includes a copy of the guidelines in its appendix. The guidelines impose an obligation to ensure certain medical procedures are in effect on the vessel.

. An isolated act of negligence under Usner includes a "reckless choice of solution to an isolated problem as well as an isolated act in performance of ongoing duty.” Adams, 515 F.2d at 91.

. Expert testimony that the alleged congeries of acts constituted an improper method of work or operation has been persuasive. See, e.g., Edynak, 562 F.2d at 225 (unseaworthy condition where expert testified that unloading method was improper); Crane, 743 So.2d at 791 (unseaworthy condition where expert testified that method employed created problems for crew); cf. Rutherford v. Lake Mich. Contractors, Inc., 28 Fed.Appx. 395, 400-01 (6th Cir.2002) (not unseaworthy where there was no evidence, expert or otherwise, that one deckhand could not safely handle a steel cable).